HAMILTON v. DILLIN.

The government of the United States clearly has power to permit limited commercial intercourse with an enemy in time of war, and to impose such conditions thereon as it sees fit; this power is incident to the power to declare war and to carry it on to a successful termination.

*It seems* that the President alone, who is constitutionally invested with the entire charge of hostile operations, may exercise this power; but whether so or not, there is no doubt that with the concurrent authority of the Congress, he may exercise it according to his discretion.

The act of Congress of July 13th, 1861 (12 Stat. at Large, 257), prohibiting commercial intercourse with the insurrectionary States, but providing that the President might, in his discretion, license and permit it in such articles, for such time, and by such persons, as he might think most conducive to the public interest, to be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury, fully authorized the rules and regulations adopted March 31st, and September 11th, 1863, whereby, amongst other things, permission was given to purchase cotton in the insurrectionary States and export the same to other States, upon condition of paying (besides other fees) a fee or bonus of four cents per pound.

The act of July 2d, 1864 (13 Stat. at Large, 375), respecting commercial intercourse with the insurrectionary States recognized and confirmed these regulations.

The charge of four cents per pound required by these regulations, was not a tax, nor was it imposed in the exercise of the taxing power, but in the exercise of the war power of the government. It was a condition which the government, and the President endued with the powers thereof, in the exercise of supreme and absolute control over the subject, had a perfect right to impose.

The condition thus imposed was entirely in the option of any person to accept or not. If any did accept it, and engage in the trade, it was a voluntary act, and all payments made in consequence were voluntary payments, and, on that ground alone (if there were no other), could not be recovered back.

The internal revenue acts of 1862 (12 Stat. at Large, 465) and 1864 (13 Id. 15), in imposing specific duties by way of excise on cotton, were not inconsistent with or repugnant to the charge in question. The two charges were different things. One was a payment as a condition of trading at all, required by the war power; the other was an excise imposed by the taxing power.

Nashville, though within the National military lines in 1863 and 1864, was nevertheless hostile territory within the prohibition of commercial intercourse, being within the terms of the President's proclamation on that subject; which proclamation in that regard was not inconsistent with the act of July 13th, 1861, properly construed.

The civil war affected the status of the entire territory of the States declared to be in insurrection, except as modified by declaratory acts of Congress or proclamations of the President.

ERROR to the Circuit Court for the Middle District of Tennessee.

Hamilton and others brought assumpsit in the court below

against Dillin, surveyor of the port at Nashville, Tennessee, to recover a charge of four cents per pound paid by them to the said defendant, from August, 1863, to July, 1864, for permits to purchase and ship to the loyal States large quantities of cotton, amounting to over seven millions of pounds. This payment was one of the fees or charges required by the regulations of the Treasury Department to be made as a condition of carrying on the said trade between those portions of the insurrectionary States within the lines of occupation of the Union forces and the loyal States.

The case was thus:

The Constitution ordains as follows:

" The *Congress* shall have power to lay and collect *taxes, duties, imposts, and excises.*"*

" The President shall be commander-in-chief of the army and navy of the United States, and of the militia of the several States, when called into actual service of the United States."†

On the 13th of July, 1861, Congress passed an act‡ by which the President was authorized, after certain preliminary measures for suppressing the insurrection, to declare by proclamation what States and parts of States were in a state of insurrection against the United States. The act proceeds:

" And thereupon, all commercial intercourse by and between the same and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue; and all goods, &c., coming from said State or section into the other parts of the United States, and all proceeding to such State or section by land or water, shall, together with the vessel or vehicle, &c., be forfeited to the United States: *Provided, however*, that the President may, in his discretion, license and permit commercial intercourse with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such inter-

---

* Article I, § 8.    † Article II, § 8.    ‡ Section 5, 12 Stat. at Large, 257

course, so far as by him licensed, shall be conducted and carried on *only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."*

In pursuance of this act the President, on the 16th of August, 1861, issued a proclamation* declaring that the inhabitants of certain States, including Tennessee, were in a state of insurrection against the United States, and that all commercial intercourse between them and the citizens of other States was unlawful, and that all goods, &c., coming from said States without the special license and permission of the President, through the Secretary of the Treasury, or proceeding to any of said States, &c., would be forfeited, &c. This proclamation excepted from its operation, amongst other things, such parts of the enumerated States as might maintain a loyal adhesion to the Union and Constitution, or might be from time to time occupied and controlled by forces of the United States. A subsequent proclamation, issued April 2d, 1863,† abrogated the exception as embarrassing " to the due enforcement of said act of July 13th, 1861, and the proper regulation of the commercial intercourse authorized by said act;" such abrogation, however, not extending to West Virginia or the ports of New Orleans, Key West, Port Royal, or Beaufort, in South Carolina.

On the 28th of February, 1862, the insurrection not making at this time further headway, the President issued an executive order thus:

" Considering that the existing circumstances of the country allow a partial restoration of commercial intercourse between the inhabitants of those parts of the United States heretofore declared to be in insurrection and the citizens of the loyal States of the Union, and exercising the authority and discretion confided to me by the act of Congress, approved July 13th, 1861, &c., I hereby license and permit such commercial intercourse, in all cases within the rules and regulations which have been or may be prescribed by the Secretary of the Treasury for the conducting and carrying on of the same on the inland waters and ways of the United States."

---

\* 12 Stat. at Large, 1262.                          † 13 Id. 731.

Under the authority of this and subsequent executive orders, the Secretary of the Treasury from time to time—that is to say on the said 28th of February, 1862, on the 28th of August, 1862, on the 31st of March, 1863, and finally on the 11th of September, 1863,—prescribed rules and regulations for carrying on the trade licensed by the President. Those last mentioned, and dated the 11th of September, 1863, being revised rules and regulations.

These last-dated regulations prohibited the transportation of goods or merchandise to or from any State or part of a State in insurrection, except under permits, certificates, and clearances, as provided therein; and the surveyors of the customs at Nashville and other places were designated as the officers to grant such permits. Authority to purchase and transport goods was to be granted only to those who should make the prescribed affidavit, and enter into bond to pay all fees required by the regulations; and no permit was to be granted for such purchase and transportation except upon the payment of such fees, or the giving of a bond to secure the same. The fees referred to, and appended to the regulations and making part thereof, consisted of various items and charges to be paid, and, amongst others,

"For each permit to purchase cotton in any insurrectionary district, and to transport the same to a loyal State, per pound ... four cents."

Accompanying the rules and regulations, dated March 31st, 1863, was the following contemporary:

"LICENSE OF TRADE BY THE PRESIDENT.

"WASHINGTON, EXECUTIVE MANSION, March 31st, 1863.

"Whereas, by the act of Congress approved July 13th, 1861, entitled, &c., all commercial intercourse between the inhabitants of such States as should by proclamation be declared in insurrection against the United States and the citizens of the rest of the United States was prohibited so long as such condition of hostility should continue, except as the same shall be licensed and permitted by the President, to be conducted and carried on only in pursuance of rules and regulations prescribed by the

Secretary of the Treasury; and whereas it appears that a partial restoration of such intercourse between the inhabitants of sundry places and sections heretofore declared in insurrection in pursuance of said act and the citizens of the rest of the United States will favorably affect the public interests:

"Now, therefore, I, Abraham Lincoln, President of the United States, exercising the authority and discretion confided to me by the said act of Congress, do hereby license and permit such commercial intercourse between the citizens of the loyal States and the inhabitants of such insurrectionary States, in the cases and under the restrictions described and expressed in the regulations prescribed by the Secretary of the Treasury, bearing even date with these presents, or in such other regulations as he may hereafter, with my approval, prescribe.

"ABRAHAM LINCOLN."

These revised rules and regulations of September 11th, 1863, were also approved in form by the President.

It was under the authority of these licenses and regulations that the four cents per pound, now sought by the plaintiffs to be got back, was levied and collected.

This license (a public document, perhaps), was not put in evidence.

By the bill of exceptions, it appeared that it was admitted on the trial that the defendant was acting surveyor of customs at Nashville during the period in question, and the only person that could grant the necessary permits; that the plaintiffs had in their possession, as owners or factors, various lots of cotton, specified in the bill, which had been purchased in pursuance of the license of the President and the regulations of the Secretary of the Treasury in that regard; that they applied to the defendant for permits to ship and transport said cotton from Nashville to a loyal State, and that the defendant, in obedience to said regulations and instructions, refused to grant such permits except on payment of the four cents per pound. It was also admitted that the regulations were well and publicly known at Nashville, and that they directed seizure and confiscation of all cotton shipped without such payment and permit, and that the

plaintiffs made no formal protest against the payment of the tax, but paid the same, and that the same was paid by the defendant into the Treasury of the United States before the commencement of this action. It was also admitted that during said term of time Nashville was within the lines of military occupation of the United States. .

The plaintiffs then put in evidence the Treasury Regulations in force at the time of the shipment of the cotton in question.

So far as to the main case. In order, however, fully to understand things, it is necessary to advert to certain statutes passed by Congress at different times, and which the plaintiffs and defendants supposed bore much upon their respective positions.

*On the plaintiffs' side of the case,* as they argued, it appeared that by a *general* internal revenue act of July 1st, 1862, an act of one hundred and nineteen sections, covering fifty-seven pages of the statute-book, and comprehending an immense list of articles taxed, Congress levied a tax of one-half cent per pound on all cotton, to be paid before its removal from the place of production.* And again, that by an act of March 7th, 1864, it raised the tax to two cents per pound in lieu of the one-half cent, where no duty had already been paid, levied, or collected on the cotton.†

*On the defendant's side,* as he conceived, the President having, on the 1st July, 1862, issued a proclamation declaring what States and parts of States were in insurrection, with a view to the provisions of an act imposing a land tax, and made no exception of any fractions of States, except the counties constituting West Virginia, Congress, on the 12th of March, 1863, passed what is known as the Captured and Abandoned Property Act; an act " to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States."

The first section enacts—

" That it shall be lawful for the Secretary of the Treasury,

---

.* 12 Stat. at Large, 465, 466.    † 13 Id. 15, 16.

from and after the passage of this act, . . . to appoint a special agent or agents to receive and collect all abandoned property in any State or Territory, or any portion of any State or Territory of the United States, *designated as in insurrection, &c., by the proclamation of the President of 1st July, 1862.*"

.The fourth section enacted—

" That all property coming into any of the United States not declared in insurrection as aforesaid, from any of the States declared in insurrection, through or by any other person than any agent duly appointed under the provisions of this act, or *under a lawful clearance* by the proper officer of the Treasury Department, shall be confiscated."

So, on the 2d July, 1864,* Congress passed " An act in addition to the several acts concerning commercial intercourse between loyal and insurrectionary States, and to provide for the collection of captured and abandoned property and the prevention of frauds in States declared in insurrection."

Its third section enacts—

" That all moneys arising from the leasing of abandoned lands, houses, and tenements, or from sales of captured and abandoned property collected and sold in pursuance of said act, or of this act, *or from* fees *collected under the rules and regulations made by the Secretary of the Treasury, and approved by the President,* dated respectively the 28th of August, 1862, 31st of March, and 11*th of September,* 1864, or under any amendments or modifications thereof, which have been or shall be made by the Secretary of the Treasury and approved by the President, for conducting the commercial intercourse, which has been or shall be licensed and permitted by the President, with and in States declared in insurrection, *shall,* after satisfying therefrom all necessary expenses, to be approved by the Secretary of the Treasury, *be paid into the Treasury of the United States;* and all accounts of moneys received or expended in connection therewith shall be audited by the proper accounting officers of the treasury."

The counsel of the plaintiffs insisted and requested the cour' to charge, that the exaction of the four cents per pound was

---

* 13 Stat. at Large, 375.

illegal and void; that it was essentially a tax and not authorized by any act of Congress, which alone had the power to impose taxes; that even if it were authorized by law, the law itself was to that extent unconstitutional and void, and that under the circumstances and state of facts agreed upon by the parties, the payment was involuntary, and no protest was necessary to entitle the plaintiffs to recover back the money thus illegally exacted. The court refused to charge as requested by the plaintiffs, but charged as follows:

*First.* That the act of July 13th, 1861, conferred power upon the Secretary of the Treasury to authorize the exactions mentioned in said plaintiffs' declaration.

*Second.* That whether the said act conferred such power or not, the action of the Secretary of the Treasury in imposing, and of the defendant in making, said exactions, was ratified and made valid by the act of July 2d, 1864, entitled "An act in addition to the several acts concerning commercial intercourse between loyal and insurrectionary States, and to provide for the collection of captured and abandoned property, and the prevention of frauds in States declared in insurrection."

*Third.* That the plaintiffs could not maintain an action to recover back said exactions, even if they had been illegal, for want of having protested against them at the time of payment.

To this charge exceptions were taken, and the correctness of these propositions was the matter which this court was now called on to decide.

*Messrs. W. M. Evarts and T. D. Lincoln (with whom were Messrs. C. Cole and E. Jordan), for the plaintiffs in error:*

I. *If. the requirement of four cents per pound was a tax levied for revenue purposes, it was, without doubt, illegally exacted;* for by the Constitution " the Congress shall have power to lay and collect taxes, duties, imposts, and excises." The power cannot be delegated.

II. *But if it could be, what is the case?* The authority claimed is rested on the power to make " rules and regula-

tions " for carrying on a certain trade. But does this carry the power to levy taxes—or if you please to change the phrase, " exact impositions," " levy *bonuses*,"—for revenue upon such trade? The two ideas are distinct; their circles nowhere touch each other. To provide the "rules and regulations " for conducting a trade relates to the conduct of the persons engaged in it, their methods of transacting their business, the imposition of such checks and safeguards as will secure a compliance with the law. To make such trade contribute in any essential form to the revenues of the country is the exercise of one of the highest prerogatives of the government, and is to be determined upon grounds widely different from the supervision and policing of the trade itself.

III. *The latter function was the function of these exactions.*

In the *Mayor* v. *Second Avenue Railroad Company*,* the city of New York required the railroad company to pay $50 for a license for running its cars, justifying the right under the power of the city to establish ordinances for the good rule and government of the city, and to provide penalties for their breach. The court says:

" This is only a taxing power in the guise of establishing ordinances for good rule and government."

This case went to the Court of Appeals.† The opinion of the court says:

" Call what it requires by name of license or certificate of payment, or anything else, its primary, and indeed only purpose is to take from the company, under coercion of the penalty which it imposes, the sum of $50 annually for each car run upon the road, for the benefit of the city. . . . It is in vain, therefore, to speak of it, or to treat it as a license or regulation of police. It is the imposition of an annual tax upon the company in derogation of its rights of property, and on that account is unlawful and void."

This same question came again before the Court of Appeals, under this same ordinance, in the case of the *Mayor*,

* 21 Howard, Practice Reports, 260.    † 32 New York, 272, 273, 274.

*&c.*, v. *The Third Avenue Railroad Company*,\* where the decision was affirmed.

The case of *The Commonwealth* v. *Stodder*,† in Massachusetts, presented a similar question.

The statute law of Massachusetts authorized the mayor and aldermen to regulate the use of omnibus and stage coaches for the transportation of persons, for hire, from Roxbury to Boston, and from Boston to Roxbury; and an ordinance was passed requiring persons who set up the running of coaches to obtain a license and pay a fee for each license. The court say:

"In the aspect in which we have been enabled to regard this part of the ordinance, *can we view it in any other light than as the assessment of a tax upon the owner of these vehicles?*"

And they decide that they cannot.

In *Lucas* v. *Lottery Commissioners*,‡ the Court of Appeals of Maryland say:

"That a license is a tax, is too palpable for discussion."

It is an abuse of terms and of the English language to use the word "fees" in reference to this exaction. Fees are the allowance to public officers for services performed; and through the whole range of custom-house revenue, they will be found to average about what the small charges in this case were, for the issuing a permit, for administering an oath as to loyalty, or oath as to invoices, &c., and they are generally fixed by statute.

IV. *The intention of Congress not to delegate the power exerted in this case, is manifest from the fact that by two different acts of Congress it has itself taxed cotton.*

One act is that of July 1st, 1862, the other the act of March 7th, 1864.§ Can it be supposed that it meant to dele-

---

\* 33 New York, 42.                                    † 2 Cushing, 563.

‡ 11 Gill & Johnson, 500; and see Collins v. The City of Louisville, 2 B. Monroe, 136; Mayor v. Beasly, 1 Humphrey, 240; License Tax Cases, 5 Wallace, 472, 474.

§ Referred to *supra*, 79.

gate to others a power to tax and to tax at a much higher rate?

The President, as we have said, had nothing and could have nothing to do with the "rules and regulations" of the Secretary of the Treasury requiring the defendant to make the exaction, and to pay the money into the treasury. They were, therefore, the secretary's own; made, not in pursuance of any lawful authority of the President acting under statute, but his own wholly. Now, the order of the secretary to a collector or subordinate is no defence for a demand for illegal duties.*

V. *Neither the prohibition of intercourse, nor the provision respecting its license, nor that concerning its regulation, had any application to the District of Nashville, in the condition in which it was at the time these exactions were made.*

The act, after providing that the President may, in the contingency mentioned, declare States and parts of States in insurrection, declares that thereupon "all commercial intercourse by and between the same and citizens thereof, and the citizens of the rest of the United States, shall cease, and be unlawful *so long as such condition of hostility shall continue;* thus making the prohibition of trade itself, and of course everything dependent thereon, applicable to any region only so long as the condition of hostility shall continue."

Now it is matter of public history, that long before the first of these exactions was made, the city of Nashville had been occupied by the National troops, and that it continued in their occupation and under the National control during all the time covered by the transactions out of which our claims arise. It would seem to be manifest, therefore, that the condition of hostility had ceased to exist, and that the provision in question could have no application there, for it cannot be maintained that a portion of our own country in which an insurrection had existed could be regarded as in a state of hostility after such insurrection had been finally suppressed therein by the National troops.

* Flanders *v.* Tweed, 15 Wallace, 450; McLane *v.* United States, 6 Peters, 426; Bend *v.* Hoyt, 13 Id. 267.

The decision in *The Ouachita Cotton*\* proceeded upon the ground that the city of New Orleans, after the occupation by the forces under General Butler, ceased to be in insurrection.

VI. *The act of July 2d,* 1864, *did not make these exactions legal by a ratification of them by Congress.*

Nearly all the fees arose prior to the passage of this act, and it could not affect them. The construction of the law of July 13th, 1861, as to all past transactions, is with the courts.†

In addition. Nothing in the act requires us to construe it as intended to validate that which was illegal before. No act can be construed to do this unless this be the plain purpose of the lawmaker.

Now, the true purposes of the act were to extend the operation of the act of March 12th, 1863; the Captured and Abandoned Property Act. *Ex. gr.,* much property had been collected and held under color of this last-named act. But as no property could be legally collected or sold that was not in fact captured or abandoned, and as much that was collected and sold, was asserted to have been neither captured nor abandoned, much of the money derived from such sales was, on that account, held by the officers making the sales. The secretary was embarrassed by this state of things. To relieve the secretary from these difficulties, and the government from the danger of so much money remaining in the hands of the agents of the Treasury Department executing this law, Congress passed this act of July 2d, 1864, requiring among other things the money on hand, collected under these laws and regulations, to be paid into the Treasury.

Another reason for this act was to enable the Secretary of the Treasury, by rules, to provide for the payment of the

---

\* 6 Wallace, 521.

† De Chastellux *v.* Fairchilds, 15 Pennsylvania State, 20; Lewis *v.* Webb, 3 Greenleaf, 333; Merrill *v.* Sherburne, 1 New Hampshire, 203, 204; Sanborn *v.* Com. Rice Co., 9 Minnesota, 279; Holden *v.* James Aden, 11 Massachusetts, 401, 402.

expense of the execution of the said act, *from the fees imposed*, from the sales of captured and abandoned property, and from the sales of the purchased property.

These provisions are entirely new in some of their features, and were enacted to avoid the difficulties and dangers before alluded to, and never intended to validate any illegal act or to settle any question of the kind now under discussion.

VII. *No formal protest was necessary to enable the plaintiff to recover in this case.*

1. There is no statute providing for a protest in such a case.

The case does not come under any of the acts providing for a protest, as a condition precedent for a suit of this kind. This exaction was wholly foreign to the purpose of this act or any act of Congress, so that there could be no provision for a protest, for no such thing was contemplated, as was done by this rule.

2. Nor was the payment a voluntary payment.

The rules and regulations, the refusal to grant the permits without the payment of the money, the presence of an army to aid in the seizure of the cotton if it were attempted to be shipped without the permit, the propriety and necessity of shipment to the loyal States, the great loss to the plaintiffs if not shipped, and the orders and action of these officers, which are a part of the known history of the country, these things show that it was a forced payment.*

*Mr. G. H. Williams, Attorney-General, and Mr. S. F. Phillips, Solicitor-General, contra.*

Mr. Justice BRADLEY delivered the opinion of the court.

There can be no question that the condition requiring the

---

* Elliott *v.* Swartwout, 10 Peters, 157; Morgan *v.* Palmer, 2 Barnewall & Cresswell, 735; Shaw *v.* Woodcock, 7 Id. 84; Ripley *v.* Gelston, 9 Johnson, 209; Clinton *v.* Strong, Ib. 377; Glass Co. *v.* Boston, 4 Metcalf, 188; Steele *v.* Williams, 8 Exchequer, 630; Parker *v.* The Great Western Railroad Co , 7 Manning & Granger, 252; Baker *v.* Cincinnati, 11 Ohio State, 534; Chase *v.* Dwinal, 7 Greenleaf, 134; Irving *v.* Wilson, 4 Term, 485; Snowden *v.* Davis, 1 Taunton, 369.

payment of four cents per pound for a permit to purchase cotton in, and transport it from, the insurrectionary States during the late civil war, was competent to the war power of the United States government to impose. The war was a public one. The government in prosecuting it had at least all the rights which any belligerent power has when prosecuting a public war. That war was itself a suspension of commercial intercourse between the opposing sections of the country. No cotton or other merchandise could be lawfully purchased in the insurrectionary States and transported to the loyal States without the consent of the government. If such a course of dealing were to be permitted at all, it would necessarily be upon such conditions as the government chose to prescribe. The war power vested in the government implied all this without any specific mention of it in the Constitution.

In England this power to remit the restrictions on commercial intercourse with a hostile nation is exercised by the crown. Lord Stowell says: "By the law and constitution of this country, the sovereign alone has the power of declaring war and peace. He alone, therefore, who has the power of entirely removing a state of war, has the power of removing it in part, by permitting, where he sees proper, that commercial intercourse which is a partial suspension of the war."* Bynhershoek says: "It is in all cases the act of the sovereign."† By the Constitution of the United States the power to declare war is confided to Congress. The executive power and the command of the military and naval forces is vested in the President. Whether, in the absence of Congressional action, the power of permitting partial intercourse with a public enemy may or may not be exercised by the President alone, who is constitutionally invested with the entire charge of hostile operations, it is not now necessary to decide, although it would seem that little doubt could be raised on the subject. In the case of *Cross* v. *Harrison*,‡ it was held that the President, as commander-in-chief,

---

* The Hoop, 1 Robinson, 199.    † Questionum Juris Publici, bk. 1, c. 3.
‡ 16 Howard, 164, 190.

Opinion of the court.

had power to form a temporary civil government for California as a conquered country, and to impose duties on imports and tonnage for the support of the government and for aiding to sustain the burdens of the war, which were held valid until Congress saw fit to supersede them; and an action brought to recover back duties paid under such regulation was adjudged to be not maintainable. The same views were held in *Leitensdorfer et al. 'v. Webb,** in reference to the establishment of a provisional government in New Mexico, in the war with Mexico in 1846, and were reiterated by this court in the case of *The Grapeshot.*†

But without pursuing this inquiry, and whatever view may be taken as to the precise boundary between the legislative and executive powers in reference to the question under consideration, there is no doubt that a concurrence of both affords ample foundation for any regulations on the subject.

Our first inquiry, therefore, will be, whether the action of the executive was authorized, or, if not originally authorized, was confirmed by Congress.

By the act of July 13th, 1861,‡ the President was authorized, after certain preliminary measures for suppressing the insurrection, to declare by proclamation what States and parts of States were in a state of insurrection against the United States; " and thereupon," the act proceeds to say, "all commercial intercourse by and between the same and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue; and all goods, &c., coming from said States or section into the other parts of the United States, and all proceeding to such States or section, by land or water, shall, together with the vessel or vehicle, &c., be forfeited to the United States: *Provided, however,* that the President may, in his discretion, license and permit commercial intercourse with any such part of said States or section, the inhabitants of which are so declared in a state of insurrection, in such

---

* 20 Howard, 176.                    † 9 Wallace, 129.
‡ Section 5, 12 Stat. at Large, 257.

articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."

In pursuance of this act the President, on the 16th of August, 1861, issued a proclamation,* declaring that the inhabitants of certain States (including Tennessee) were in a state of insurrection against the United States, and that all commercial intercourse between them and the citizens of other States was unlawful, and that all goods, &c., coming from said States without the special license and permission of the President, through the Secretary of the, Treasury, or proceeding to any of said States, &c., would be forfeited, &c. This proclamation excepted from its operation, amongst other things, such parts of the enumerated States as might maintain a loyal adhesion to the Union and Constitution, or might be from time to time occupied and controlled by forces of the United States. A subsequent proclamation, issued April 2d, 1863,† abrogated the said exception as embarrassing " to the due enforcement of said act of July 13th, 1861, and the proper regulation of the commercial intercourse authorized by said act;" such abrogation, however, not extending to West Virginia, or the ports of New Orleans, Key West, Port Royal, or Beaufort, in South Carolina.

Under, and in supposed pursuance of, this act and these proclamations, the license of the President and the trade regulations of the Secretary of the Treasury were made under which the plaintiffs purchased and shipped the cotton in question. These public acts of the executive department must be construed as one system. The license of the President to hold commercial intercourse cannot be separated, in determining this controversy, from the treasury regulations which were adopted for the government of that intercourse. There is an evident effort on the part of the plaintiffs to separate them; and it is worthy of passing observation that

---

* 12 Stat. at Large, 1262.                    † 13 Id. 731.

the actual license of the President was not put in evidence. But a public act of the government of such importance may receive the judicial notice of the court; and availing ourselves of that right we find that the regulations referred to as adopted September 11th, 1863, are revised regulations, expressly approved by the President, and supplementary to previous regulations adopted March 31st, 1863, to which the President had attached the license of same date, under which the entire authority to pursue the trade in this cotton arose.   This license, after reciting the act of Congress of July 13th, 1861, so far as relates to commercial intercourse, proceeds as follows: "And whereas it appears that a partial restoration of such intercourse between the inhabitants of sundry places and sections heretofore declared in insurrection, in pursuance of said act, and the citizens of the rest of the United States, will favorably affect the public interests: Now, therefore, I, Abraham Lincoln, President of the United States, exercising the authority and discretion confided to me by the said act of Congress, do hereby license and permit such commercial intercourse between the citizens of loyal States and the inhabitants. of such insurrectionary States in the cases and under the restrictions described and expressed in the regulations prescribed by the Secretary of the Treasury, bearing even date with these presents, or in other such regulations as he may hereafter, with my approval, prescribe."

It is clear, therefore, that the license to trade given by the President was a conditional one, requiring a full compliance with the regulations adopted by the Secretary of the Treasury, between whom and the President, as would be supposed, there was entire harmony and even unity of action.

The question then comes to this: Under the supposed authority of the act of July 13th, 1861, the President and Secretary of the Treasury authorized and licensed cotton to be purchased in and transported from insurrectionary districts, on condition that the parties availing themselves of the license should pay to the government four cents per pound and all other fees.   If we might offer a conjecture as to the

motive for this regulation, it may have been this, namely: that such a bonus would help to counterbalance, in favor of our government, any benefit which the enemy might derive from a sale of the cotton instead of its destruction. But the actual motive is not material. The government chose to impose this condition. It supposed it had a right to do so. No one was bound to accept it. No one was compelled to engage in the trade. Not the least compulsion was exercised. The plaintiffs endeavor to put the case as if they were obliged to pay this exaction to save their property. This is not a true view of it. It is admitted that the property was purchased under the license. If so, it was also purchased in view of the regulations to which the license referred. The regulations themselves show that the permit to purchase and the permit to export were correlative to each other; that no one was permitted to purchase who did not enter into bond to pay all fees required by the regulations, amongst which the charge of four cents per pound on cotton was expressly inserted. In short, the permit to purchase and export constituted substantially one permit, and that was granted only on the condition of paying the prescribed fees, as before stated. The clearance of particular lots or cargoes required afterwards, when the property was actually shipped, was necessary to show that the stipulated conditions had been complied with, and that the particular articles specified were free for transportation. The whole series of acts constituted, so far as the right to trade and transport was concerned, but one transaction; a conditional permission given on the part of the government, and the acceptance of and compliance with that condition on the part of the trader.

The position in which the plaintiffs put themselves, therefore, was an entirely voluntary one. They have no right now to say: "It is true we purchased the cotton under a license which required us to pay a certain bonus; but having purchased it, we were entitled to repudiate the condition, although we had no right to make the purchase except by virtue of the license." Much less have they now a right to

say, after having complied with the condition without murmur or objection, that the bonus was extorted from them by compulsion.

Whether, therefore, the President and Secretary of the Treasury did or did not rightly judge as to their powers under the act, the plaintiffs evidently agreed with them and voluntarily applied for permission to engage in the trade on the conditions imposed, and voluntarily paid the bonus which is now sought to be recovered back. The case does not come within any class of cases on which the plaintiffs rely to take it out of the rule as to voluntary payments. In our judgment, therefore, the defence in this case might have rested on this ground alone.

But we are also of opinion that the conditions imposed were authorized by the act of July 13th, 1861. Its language has been already quoted. The material part in reference to the question under discussion is the proviso of section three, which is as follows: "The President may, in his discretion, license and permit commercial intercourse . . . in such articles, and for such time, and by such persons as he in his discretion may think most conducive to the public interest; and such intercourse . . . shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."

It is contended that the imposition of the bonus of four cents per pound was not a "*rule*" or a "*regulation*" within the fair meaning of the act; and it is conceded that in many cases the power to make rules and regulations on a particular subject is a limited power, having respect to mode and form, and time and circumstance, and not to substance. But it must also be conceded that in other cases the power is much more extensive and substantial. Thus, in the Constitution, the several powers "to regulate commerce," "to establish a uniform rule of naturalization," "to make all needful rules and regulations respecting the territory or other property belonging to the United States," are understood to give plenary control over those subjects. The power to regulate commerce has been held to include the power to suspend

it;* and the power to make rules and regulations respecting the territory of the United States, has been held to include the power to legislate for and govern such territory, and establish governments therein.† The extensive effect given to these clauses is undoubtedly largely due to the character of the instrument and that of the donee of the powers, to wit, the legislature of the United States, to whom the grant of a power means the grant of a branch of sovereignty. It shows, however, that the rule of construction depends, at least in some sort, upon the nature of the subject-matter. In the case before us, the power of the government to open and regulate trade with the enemy was intended to be conferred upon the President and the Secretary of the Treasury. The power of regulation in such a case is to be taken in its broadest sense, and, in our judgment, included the power to impose such conditions as the President and Secretary should see fit.

The statutes relating to the internal revenue, passed July 1st, 1862, and March 7th, 1864, which have been referred to for the purpose of showing that Congress imposed a special tax upon cotton, and, therefore, could not have intended by the act of 1861 to sanction the regulations of the treasury now in question, do not, in our judgment, have that effect. The act of 1862 imposed a tax of half a cent per pound on all cotton, to be paid before its removal from the place of production. The same act and section imposed various taxes on a hundred other articles. The question is, did Congress intend, by the imposition of these taxes, to revoke by implication, any power given to the Executive Department of imposing such regulations as it might see fit for the carrying on of trade with insurrectionary districts? We answer, certainly not. The two subjects were entirely distinct. No conflict or repugnancy could arise in relation thereto. When, in March, 1863, the President issued his license to trade in cotton and other articles in the insurrectionary districts, under and subject to the conditions contained in the regula-

---

* 1 Kent, 432.          † 4 Wheaton, 422; Story on the Constitution, § 1328.

tions adopted by the Secretary of the Treasury, his action was not inconsistent with or repugnant to the internal revenue law passed the year before.   It had nothing to do with that law or the subject-matter of it.   The conditions exacted by him were not imposed in the exercise of the taxing power, but of the war power of the government.   The exaction itself was not properly a tax, but a bonus required as a condition precedent for engaging in the trade.   Whether, when the condition was fulfilled, the cotton became subject to the internal revenue law is a question we are not called upon to decide.   There was no inconsistency between the regulations and the law any more than there is between a license tax for carrying on a particular trade and the excise imposed on the products of that trade.   The act of March 7th, 1864, raised the internal revenue tax on cotton to two cents a pound where no duty had already been levied, paid, or collected thereon.   Neither does this act present any inconsistency with the regulations in question.   If it refers to them at all (when speaking of duties already paid) it contains an implied recognition of them.   If it does not refer to them, it does not contravene them.

The position that Nashville, being within the National lines, was not hostile territory in 1863 and 1864, and, therefore, not within the prohibition of commercial intercourse contained in the act of 1861, is not tenable.   The State of Tennessee was named in the President's proclamation as one of the States in insurrection; and, as we have seen, the exceptions made in his first proclamation in favor of maintaining commercial intercourse with parts of such States remaining loyal, or occupied by the forces of the United States, were abrogated by the proclamation of April 2d, 1863, except as to West Virginia and certain specified ports. There was nothing in this action of the President repugnant to, or not in conformity with, the act of 1861.   " This revocation," as remarked by this court in the case of _The Venice,_* " merely brought all parts of the insurgent States under the

---

* 2 Wallace, 278.

special licensing power of the President, conferred by the act of July 13th, 1861." The act gave the President power, where a State or part of a State remained irreclaimable, to declare that the inhabitants of such State, or any section or part thereof where such insurrection existed, were in a state of insurrection. This power clearly gave the President a discretion to declare an entire State, where the insurrection was persisted in, or only a hostile district therein, in a state of insurrection. Finding the attempt to discriminate between the different parts of a State (except in peculiar cases) impracticable, he abandoned the attempt, and declared the entire State in a state of insurrection. He clearly had authority so to do, more especially as the insurrection was supported by State organizations and the actual State authorities. Thenceforth the war became a well-defined territorial war, and was in great measure conducted as such. The further provision of the act, that all commercial intercourse with the insurrectionary districts should cease " so long as such condition of hostility shall continue," could not be construed as allowing such intercourse to be resumed by individuals at will, as fast and as far as our armies succeeded in occupying insurgent territory. The " condition of hostility" remained impressed upon the insurrectionary districts until it was authoritatively removed by the proclamation of the President at the close of the war.

This view of the meaning of the act of 1861 is corroborated by the act of March 12th, 1863, respecting abandoned and captured property.

On the 1st of July, 1862, the President had issued a proclamation declaring what States and parts of States were in insurrection, with a view to the provisions of the act imposing a land tax, and made no exception of any fractions of States, except the counties constituting West Virginia. Expressly referring to this proclamation, Congress, in the fourth section of the act referred to, enacted " that all property coming into any of the United States not declared in insurrection as aforesaid, from any of the States declared in insurrection, through or by any other person than any agent

duly appointed under the provisions of this act, or under a lawful clearance by the proper officer of the Treasury Department, shall be confiscated."* This is a clear recognition on the part of Congress of the President's demarcation of insurrectionary territory. It is also a recognition of the treasury regulations as to intercourse with that territory—not, perhaps, of any specific regulations, but of the applicability of such regulations to all portions of insurrectionary territory, whether under occupation of the Union forces or not.

But it is unnecessary to pursue this subject. We have frequently held that the civil war affected the status of the entire territory of the States declared to be in insurrection, except as modified by declaratory acts of Congress or proclamations of the President; and nothing but the apparent earnestness with which the point has been urged would have led to a further discussion of the point.†

We are also of opinion that the act of July 2d, 1864,‡ recognized and confirmed the regulations in question. It is sufficient to quote a portion of the third section to evince the correctness of this conclusion. It enacts as follows: "That all moneys arising from the leasing of abandoned lands, houses, and tenements, or from sales of captured and abandoned property collected and sold in pursuance of said act, or of this act, or from fees collected under the rules and regulations made by the Secretary of the Treasury, and approved by the President, dated respectively the 28th of August, 1862, 31st of March, and 11th of September, 1863, or under any amendments or modifications thereof, which have been or shall be made by the Secretary of the Treasury and approved by the President, for conducting the commercial intercourse, which has been or shall be licensed and permitted by the President, with and in States declared in insurrection, shall, after satisfying therefrom all necessary

---

* Act of March 12th, 1863, 12 Stat. at Large, 820, § 4.

† See Mrs. Alexander's Cotton, 2 Wallace, 404; Coppell *v*. Hall, 7 Id. 542; McKee *v*. United States, 8 Id. 163; and numerous other cases.

‡ 13 Stat. at Large, 375.

expenses, to be approved by the Secretary of the Treasury, be paid into the treasury of the United States; and all accounts of moneys received or expended in connection therewith shall be audited by the proper accounting officers of the treasury."

Here the regulations in question are referred to by name and date, and the money accruing under their operation (the great bulk of which was derived from the bonus on cotton) was directed to be paid into the treasury. It is designated by the term "fees," it is true, but that was the designation used in the regulations themselves. It will be observed that the law was prospective, relating to moneys thereafter to be received, as well as to those already received. This was clearly an implied recognition and ratification of the regulations, so far as any ratification on the part of Congress may have been necessary to their validity.

It is hardly necessary, under the view we have taken of the character of the regulations in question, and of the charge or bonus objected to by the plaintiffs, to discuss the question of the constitutionality of the act of July 13th, 1861, regarded as authorizing such regulations. As before stated, the power of the government to impose such conditions upon commercial intercourse with an enemy in time of war as it sees fit, is undoubted. It is a power which every other government in the world claims and exercises, and which belongs to the government of the United States as incident to the power to declare war and to carry it on to a successful termination. We regard the regulations in question as nothing more than the exercise of this power. It does not belong to the same category as the power to levy and collect taxes, duties, and excises. It belongs to the war powers of the government, just as much so as the power to levy military contributions, or to perform any other belligerent act.

We perceive no error in the record, and the judgment of the Circuit Court must be

AFFIRMED.

### Note.

At the same time with the preceding case was adjudged the case of *McClelland* v. *United States;* an appeal from the Court of Claims; in which the claimant sought to recover payments of four cents per pound on cotton, made, as was admitted, under and in pursuance of the license of the President, and the rules and regulations prescribed by the Secretary of the Treasury, whose validity was considered in the case just above reported. There was a demurrer to the petition which the Court of Claims sustained, and, as this court, *after a full argument by Messrs. J. W. Denver and C. F. Peck, for the appellant,* now adjudged, rightly; declaring that this case was substantially decided by the preceding one. The judgment of the Court of Claims was accordingly

AFFIRMED.