Davis, J.,
delivered the opinion of the court:
These two suits are brought by the same claimant; were heard and submitted together; and have a common finding of facts.
*380 On. tlie 25th August, 1865, the President informed Major-General Thomas that he had reason to believe that frauds were being- perpetrated in the collection of cotton in Alabama, and instructed him to make inquiries, and to deal in the most summary manner with all persons found guilty, whether connected with the Treasury or military.
On the 29th of August, 1865, the claimant was appointed a bonded agent for the collection of cotton in Choctaw County, Alabama. He entered upon his duties, but was suspended on the 16th of the next month, and a week later, on the 23d September, was arrested by military authority. On the 5th of the following October, by virtue of an order of the commanding-general of the department, a military commission was convened, before which the claimant was arraigned, charged with fraud in combining with others to purchase government cotton at a price far below its real value. He pleaded “ not guilty” to the charges and specifications and denied the jurisdiction of the court. On the 25th of October, after hearing and argument, he was found guilty, and was sentenced to pay a fine of $90,000, and to be imprisoned at hard labor for one year, and until the fine should be paid. On the 7th of November, 1865, he paid the* fine, and on the 8th of the same month the remainder of the sentence was remitted. The money collected on the fine was sent to the Adjutant-General, in Washington, and by him passed over to the Secretary of the Treasury. The Secretary of the Treasury allowed one Moulton 25 per cent, upon it as a commission for his services in securing it, and the balance remained in the captured and abandoned property fund in the hands of General Spinner as special agent, until February 24, 1866, when it was covered into the Treasury.
The military authorities intended to fix this fine at a sum which should place in the Treasury the exact value of the cotton which had been fraudulently sequestered with the connivance of the claimant. It turned out, however, that cotton was .-still missing and unaccounted for to the amount of $4,243.75. Through the instrumentality of the claimant, after he had paid his fine, this amount was also recovered, and the claimant was allowed by the Secretary of the Treasury a commission of 33J •per cent, upon it.
The first of these suits in date, No. 3612, is brought to recover -a commission of 25 per cent, upon the $90,000, on the ground *381 that it represents cotton secured for the Treasury through the claimant. The second in date, though treated in argument as the first in importance, is brought to recover the fine of $90,000, which was, it alleges, collected without authority of law. The complaint demands the whole $90,000; but in his oral statement of his case the claimant’s counsel laid claim as of right only to the $57,500 which actually went into the Treasury; and further said that his client, whatever his legal rights may be, regards himself as morally entitled only to the amount of the commissions which he claims in the other suit, and only desires judgment for that sum.
In the elaborate and able argument of the case, on both sides, many points were presented which become unimportant in the view which we take of the facts. It is due to counsel, however,, that we should express our opinions on the points which they regard as essential. We shall do this as briefly as we can, consistently with the imimrtance of the subject.
I. We think that, when the facts warrant it, a contract can-be implied to refimd money paid into the Treasury in order to-satisfy a' fine imposed by a military commission on a conviction void for want of jurisdiction. (Devlin's Case, 12 C. Cls. R., 266.)
II. Assuming that the money was illegally collected from the claimant, we think no action could be maintained against the government for its recovery while it was in the hands of the-military authorities. The taking in such case would have been tortious, and could have entailed no liability on the part of the United States. (Gibbon's Case, 8 Wall., 269; Langford's Case, 101 U. S., 341.)
III. Nor could such an action have been maintained against-the government while the money was in the hands of General Spinner as special agent. His retention of the fund from the-Treasury was illegal, and was subsequently condemned by Congress (15 Stat. L., 251), and payments from the same except on judgments of this court were forbidden (ib., 244). The Consti'tution intrusts Congress with the custody of the public money,, and with the power to authorize obligations to be made to pay it out. The Treasurer is the official custodian for Congress, and unless money is in his custody, or in the hands of the persons authorized by law to receive it on behalf of the United States, it is not in the possession of the United States. The *382 fact that in the early cotton cases many judgments were ren■dered against this fund before it was covered into the Treasury does not aifect our opinion upon this point. Those judgments were rendered on returns from the Treasury which indicated that the Secretary of the Treasury regarded the money as subject to judgments rendered by this court under the special act which requires the court to adjudicate the cases, and they directed the Secretary to pay such judgments as might be rendered against the fund. The proceedings under that special act have no bearing upon the general questiou discussed in this case.
IV. We are of opinion that the military commission had power to hear and determine the charges against the claimants.
It must be borne in mind that this commission was not a court-martial, and that, except in its forms for proceedings, it had little in common with one. A court-martial is one of the ordinary judicial institutions of the country, employed in time •of peace as well as in time of war to administer justice according to the articles of war upon persons actually or construct- • ■ively in the military or naval service. The claimant was a citizen, and the court took jurisdiction over him and his offenses by virtue of the war power vested in the commanding general by direction of the President, with the express or implied sanction of Congress.
Nor, on the other hand, was it an exercise of arbitrary power, to be excused by an overwhelming necessity in the presence of extreme danger caused by insurrection or invasion, and the insufficiency of ordinary law to secure public safety and protect life and property. It was the act of a military tribunal substituted in conquered territory by the conqueror for the ordinary ■courts of law, which had disappeared or been superseded.
Up to the outbreak of the Avar the constitutional rights of the citizen of a Southern State were identical with those enjoyed by persons domiciled in a Northern State. The proclamation of the President converted him into a public enemy, whose rights were defined by the laws of war. But when the actual conflict ceased, he was not at once restored to his full civil rights. Peace and the reign of civil law did not immediately folloAV the laying doAvn of arms. The conqueror liad first to decide many questions Avhich, had the struggle been be-•tAveen independent powers, would have been the subject of *383 negotiation and treaty. It is well known that there was a great conflict of opinion as to the legal status of the conquered States, and that meanwhile and for some time after the surrender there was great need for the continued presence of an armed force to preserve order and society. This very case has given us glimpses of the disorganization — disbanded soldiers, camp followers, and disreputable adventurers stealing and plundering ; and civil courts, civil officers, and the oi’dinary civil machinery for the jirotection of property and life stricken down by the sword.
The Supreme Court, in solving such of these problems as it had to solve, proceeded with caution. In Anderson’s Case (9 Wall., 56) it held that the date of the President’s proclamation of August 20, 1866, should “be accepted as the day when the rebellion was suppressed, as respects the rights intended to be secured by the Captured and Abandoned Property Act.” In the case of The Protector (12 Wall., 700), modifying this statement, it said:
“ There were two proclamations declaring that the Avar had closed ; one issued on the 2d April, 1866, embracing the States of Virginia, North Carolina, South Carolina, Georgia, Florida, Mississippi, Tennessee, Alabama, Louisiana, and Arkansas; aud the other issued on the 20th August, 1866, embracing the State of Texas. * * * We must take the dates of these proclamations in ascertaining * * * the close of the war in the States mentioned in them.”
In a still later ease that court showed its clear purpose to sustain belligerent authority up to the respective dates of the proclamations. It is said that from the time when the States were declared by the President to be in insurrection—
“The* war became a Avell-deflned territorial war. * * * The 'condition of hostility ’ remained impressed upon the insurrectionary districts until it was authoritatively removed by the proclamation of the President at the close of the war.” (Hamilton v. Dillon, 21 Wall., 95.)
This leaves no doubt that Avhen the events took place Avhich form the subject of the present controversy a state of Avar prevailed in the district in Avhich they occurred as absolute, in its consequences, as that Avhich existed before the surrender of the Confederate armies. What those consequences are upon a loyal citizen of the United States in the enemies’ country must ■be determined by the Constitution and laws of the United *384 States as expounded by its court of bigliest authority. Elementary writers on jmblic law have been cited in argument; but while the opinion of a publicist may have weight in measuring the rights and duties of the United States as a belligerent in their relations with their enemies, it ceases to be of authority in questions between them and their officers on one side and their citizens on the other, except so far as in accord with their Constitution and laws, and the decisions of their courts.
The first important action of the Supreme Court- was in the Prize Oases (2 Black, 635), in which the legality of the blockade was -drawn in question. It there said:
“ When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have commenced hostilities against-their former sovereign, the world acknowledges them to be belligerents, and the contest a war.”
In The Venice (2 Wall., 274), the court thus stated one consequence of a state of war:
“The rule which declares that war makes all the citizens or subjects of one belligerent enemies of the government and of all the citizens or subjects of the other, applies equally to civil and to international wars. (Prize Cases, 2 Black, 666; concurred in by dissenting justices, id., 687-8.) Either belligerent may modify or limit its operation as to persons or territory of the other; but, in the absence of such modification or restriction, judicial tribunals cannot discriminate in its application.”
In The Grapeshot (9 Wall., 129), the authority of a provisional court established in New Orleans after its capture was called in question. The court said:
“It became the duty of the National Government, wherever the insurgent power was overthrown, and the territory which had been dominated by it was occupied by the national forces, to provide as far as possible, so long as the war continued, for the security of persons and property, and for the administration of justice. The duty of the National Government in this respect was no other than that which devolves upon the government of a regular belligerent, occupying, during the war, the territory of another belligerent. It was a military duty, to be performed by the President as.commander-in-chief, and intrusted, as such, with the direction of the military force by which the occupation was held.”
*385 In Milligan’s Case (4 Wall., 127) the court say:
“There are occasions when martial rule can be properly applied. If in foreign invasion or civil war the courts are actually closed, and it is impossible to anminister criminal justice according to law, then, on the theater of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority thus overthrown, to preserve the safety of the army and society, and, as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course.** During the late rebellion it could have been enforced in Virginia where the national authority was overthrown, and the courts driven out.”
In Mechanics and Traders’ Bank v. Union Bank (22 Wall., 276), the court said:
“It has been determined thatthe power to establish by military authority courts for the administration of civil as well as criminal justice in portions of the insurgent States occupied by the national forces is precisely the same as that which exists when foreign territory has been conquered and is occupied by the conqueror.”
The learned judge who dissented based his dissent upon the absence of special authority from the President to establish the military court which had given the judgment; but in the present case it appears that there was a special order from the President to prosecute offenders like the claimant, and the objection therefore disappears.
In Leitensdorfer v. Webb (20 Howard, 176) the court held that the President could extend a judicial system over and create courts with civil and criminal jurisdiction in conquered foreign territory, which would remain in force after the cessation of actual hostilities.
In Dickelman’s Case (92 U. S., 520), the court say:
“ Martial law is the law of military necessity in the actual presence of war. It is administered by the general of the army, and is in fact his will. Of necessity it is arbitrary; but it must be obeyed.”
In Dow v. Johnson (100 U. S., 158) the court say that in case of conquest “ the municipal laws, that is, such as affect private rights of persons and property, and provide for the punishment of crime, * * * are considered as continuing, unless suspended or superseded,” which necessarily implies the right to suspend or supersede them; and the court refers with approval to the English case of Elphinstone v. Bedreechund to show that this *386 right continues after the cessation of actual hostilities, so as to affect acts clone, “if not flagrante, yet nondum cesscmte bello.”
Thus it appears that the Supreme Court has settled several things which have a strong bearing upon the present case : 1st, that the right to administer justice by military courts acting under executive direction in the Southern States after conquest was the same in every respect that it would have been in a foreign country conquered by the United States; 2d, that that right extends both to the trial and determination of civil causes and to the trial and punishment of criminal offenders; 3d, that it is within the discretion of the conqueror either to exercise this power in accordance with the laws of. the conquered country or to supersede the whole or any part of those laws at its discretion; 4th, that these rights, as has already been noted, survived/intil the war was terminated by the President’s proclamations.
The question we are considering is now practically reduced to this: Whether a Treasury agent, appointed to collect and care for captured government property in a conquered country, who, during the time of war, whether foreign or civil, collusively permits that property to be secreted and carried away, commits an offense for which he can be tried, sentenced, and punished by a military court under executive direction in the absence of an act of Congress defining the offense.
To this question we can make but one answer — that he can. As the civil courts cannot interfere to prevent the conquest of enemies’ territory, so they cannot impose conditions upon its military possession and government during the continuance of war. They cannot curtail the war power of the United States. That power is defined in the cases we have cited, especially in Milligan’s case and in Diekelman’s case, and in Dow v. Johnson, in full accord with the law of nations. If an act of jurisdiction similar to that exercised on the claimant were performed on a citizen or subject of a foreign power in a conquered foreign country during time of war, we cannot doubt that it would be justified by the political department of the government and sustained in the courts. We can see no difference between the rights of the citizen and the alien in this respect. And further, the conquering ]>ower may supersede any or all the laws of the conquered. It would be most unreasonable to require prosecuting officers and the court, in the emergencies of war, to *387 limit up justifying' statutes and laws and law authorities of the enemy to warrant prosecution and conviction. It would be equally unreasonably considering our form of government and how far it relegates the punishment of offenses against property and life and society to State authorities, to permit no offense to be punished except those defined in an act of Congress. The exigencies of a state of war demand that the conqueror should possess the power of punishing offenses against life and against projierty and against the peace, and other like crimes and misdemeanors, which have been the subject of criminal punishment in all times and among all nations. If he punishes needlessly or too severely the Executive will check and rebuke him, and if the Executive is a party to needless harshness or cruelty, or to any act whose aim or spirit is hostile to liberty, our institutions enable a free people to visit him with speedy condemnation. .
Y. It is immaterial whether the proceedings under which the claimant’s money was taken from him can or cannot be justified in law. It is clear that the money subsequently passed into the Treasury with his consent for the purpose of making good the losses which the government had suffered through his frauds. Having consented to that legal application of the money, it is of no consequence whether it was originally acquired legally or illegally, and he cannot now, in his suit to recover the fine, set up that the original act was illegal. Even if he were not estop-ped from such proceeding, it is perfectly clear that no contract can be implied from all the facts to repay any part of the money. This point is sufficient to support the judgment which we shall order to be entered in the defendant’s favor in the suit for the recovery of the fine, without regard to the jurisdiction of the court either to hear and determine the case or to impose the fine.
It appears from Finding XY that “ the money in question was collected in the form of a fine * * * as the value of certain cotton of which he [the claimant] had deprived the United States.” After the payment of the fine the claimant submitted to the Secretary of the Treasury a statement, which will be found in Finding XVIII, of the whole amount of such cotton, showing an aggregate of 935 bales, of the value of $94,243.75. In this statement the amount of the fine, $90,090, was deducted from this sum as a “recovery of government property” to that *388 extent, and lie represented that there was yet “due on said cotton $4,243.75.” He asked to have that balance relinquished to him. The decision of the Secretary on this request will be found in Findings XYII and XIX. He authorized the commander of the department to pay the claimant one-third of this balance for his service. It appears by Finding XX that the military authorities paid to the claimant the sum of $1,414.45, being one-third of the sum of $4,243.35, and that the payment was made and received in accordance with the directions of the Secretary of the Treasury. In our opinion the claimant, by these proceedings, gave his assent to the application by the government of the money collected on the fine to the satisfaction of its losses by reason of the claimant’s frauds. The government made the application in accordance with the claimant’s assent and agreement. No cause of action was left to the claimant growing out of the acts of the military in Alabama. This view of the facts makes it unnecessary to consider the effect of the amendment to the Captured and Abandoned Property Act made in 1864.
VI. As to the suit to recover commissions, the claimant earned no commissions on the $90,000 worth of cotton. He attempted to defraud the government of this cotton, and the fraud was exposed and the money recovered through the instrumentality of Moulton, who was paid the usual commission for the recovery of so much cotton. The claimant has already received a commission of 33-J- per cent, upon the remainder, which is all he is entitled to.
The judgment of the court in No. 3612 is that the petition be dismissed.
And in No 6395 that the petition be dismissed.