## UNITED STATES v. SMITH.

(District Court, D. Massachusetts, August 23, 1922. Supplemental Opinion, January 8, 1923.)

No. 1742.

1. War ⬨⇒4—War Industries Board held not to have acted unreasonably or in bad faith in regulating wool market.

The War Industries Board, as the representative of the President, *held* not to have acted unreasonably, arbitrarily, or in bad faith in 1918 in undertaking to control the wool market by a system of permits or licenses to dealers, who were required to agree to pay to the government all profits in excess of a specified percentage, though it may have stretched its powers or acted under a mistake as to them.

2. War ⬨⇒4—Agreement by wool dealer with government board to obtain licenses held voluntary and binding.

Where the War Industries Board in 1918 undertook to control the wool market by a system of permits or licenses to dealers, who were required to agree to abide by the board's regulations, one of which required payment to the government of all profits in excess of a specified percentage, a wool dealer was under no compulsion to take a permit, and, where he chose to do so, his agreement to abide by such regulations was voluntary and binding on him after he had had the benefit of the agreement.

⬨⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Pleading** ⬥⟶192(6)—**Objection that money sued for is to be used illegally not open, when not appearing from declaration.**

In a suit against a wool dealer licensed by the War Industries Board to recover excess profits which he agreed to pay to the government, the objection that a government bureau intends illegally to distribute the money among wool growers is not open on demurrer, where such illegal purpose is not stated in the declaration.

**4. War** ⬥⟶4—**A government department or bureau is without authority to disburse government money to persons having no lawful claims.**

The Bureau of Markets of the Department of Agriculture *held* without authority to distribute excess profits recovered by the government from licensed wood dealers during the war among wool growers, who have no legal or equitable claims against the United States.

**5. War** ⬥⟶4—**Bureau of Markets held without authority to distribute funds among wool dealers.**

The Appropriation Act of May 31, 1920, to enable the Bureau of Markets of the Department of Agriculture "to continue * * * the distribution among the growers of wool clip of 1918 of all sums heretofore or hereafter collected," or the Appropriation Act of 1919 did not confer any authority on the Bureau to distribute excess profits received from licensed wool dealers during the war among wool growers, who have no legal or equitable claims against the United States, and, if so construed, they would be unconstitutional.

**6. United States** ⬥⟶129—**In action by United States, purposed illegal use of money recovered not a defense.**

In an action by the United States to recover money due from wool dealers licensed by the War Industries Board, the fact that a department intends making an illegal use of the money recovered is not a defense.

At Law. Action by the United States against Ransom E. Smith. On demurrer to declaration. Overruled.

The United States Attorney.

Sherman L. Whipple and Lothrop Withington, both of Boston, Mass., for defendant.

MORTON, District Judge. This is an action to recover profits which the defendant, a central wool dealer, made during the year 1918 in excess of 5 per cent. on his gross sales. It was heard on demurrer to the declaration; but the parties introduced by agreement various orders and official letters and regulations on the theory that the court took judicial notice of such documents. The case is therefore to be decided on the declaration and demurrer in connection with the orders, etc., that have been called to the Court's attention.

The act of 1916, § 2 (Comp. St. §§ 3115a–3115e) established a Council of National Defense and authorized it to constitute subordinate agencies and boards. Under the Act the War Industries Board was created. Its powers and duties are defined in a letter from President Wilson to Mr. Baruch; it appears not to have been expressly recognized in the statutes. Its functions toward the Council of National Defense were merely advisory. Later it became the personal agency of the President, and from that source obtained very large real powers.

The preliminary estimates of the quantity of wool which would be required for government and civilian consumption during the year 1918 amounted to about double the available supply. The War Industries Board believed—rightly—that a bad situation would be created

if the government went into the market in competition with private individuals for this short supply. It therefore undertook what was in effect the control of wool. It did this by a system of permits or licenses to dealers in wool, not undertaking to reach the growers, and by fixing the prices at which dealers should sell. The trade between the dealers and the growers was uncontrolled; but dealers were expected to pay fair prices, having due regard to the sale prices fixed by the government for dealers. The board required that licensed dealers should notify the government of all wool which they purchased. The government thereupon graded the wool, and either bought it from the dealer at the price fixed, or directed the dealer to whom it should be sold, or informed some manufacturer that he was free to buy it of that dealer. The War Industries Board did not obligate itself to purchase wool that came into dealers' hands; but it seems to have regarded itself as morally bound to do so, and in fact (it is said) did take over at the prices fixed by it all the wool tendered to it by dealers up to the end of 1918. Dealers were permitted by the board to charge a profit, called a "commission," of 4 per cent. on the selling price of all wool sold by them. In connection with the permits which it issued, the board exacted from permittees written agreements that they would abide by the board's regulations, one of which was that all profits in excess of 5 per cent. on the gross amount of their sales should be paid to the government. The purpose behind this arrangement appears to have been to prevent the dealers from profiteering, by crowding down prices paid to growers, and creating for their own benefit a wide margin between them and the resale prices fixed by the board.

The defendant was a wool dealer, and he made profits in excess of 5 per cent. of his gross sales. This suit is based on the agreement contained in the permit, in connection with the regulation referred to. The defendant contends that he is not bound by this agreement; that the War Board acted arbitrarily and without right in attempting to control the business of dealing in wool; that it had no right to require permits, nor to attempt to penalize or discriminate against persons who dealt in wool without permits; that its assertion of such authority was illegal; and that, in deferring to this assertion of authority and taking a permit, he was acting under coercion and duress, which relieve him from his agreement. He further contends that the avowed purpose of the government in suing for the profits is to pay them over to the wool growers; that this purpose is entirely illegal; and that on this account also the action cannot be maintained.

[1] The industrial situation existing during 1918 was one of the greatest difficulty and confusion. The price of wool was not regulated (U. S. v. American Woolen Co. [D. C.] 265 Fed. 405); but it was necessary that some form of control should be exercised over it. There was nobody that stood nearer that task than the War Industries Board, which as the President's representative had authority over similar matters. On the case before me it certainly cannot be said that the board acted unreasonably or arbitrarily or in bad faith in what it did, although it may have stretched its powers or have acted under a mistake as to them.

285 F.—48

[2] The defendant was under no compulsion to take a permit. He could do so or not, as he chose. If he had refused, doubtless he would have been discriminated against by the board. Balancing advantages against disadvantages, it was for him to decide whether he would take a permit or stand upon his rights without one. He took one and made the agreement here in suit. It was his voluntary act. Hamilton v. Dallin, 21 Wall. 73, 90, 91, 22 L. Ed. 528; Silliman v. U. S., 101 U. S. 465, 25 L. Ed. 987. It is said in Daniels v. Tearney, 102 U. S. 415, at page 421 (26 L. Ed. 187), that "where a party has availed himself for his benefit of an unconstitutional act, he cannot * * * aver its unconstitutionality as a defense." The defendant has had the benefit of the agreement, and I think he should be held to the burden of it. U. S. v. Powers (West. Dist. of Mich., July 5, 1921) 274 Fed. 131.

[3] The avowed purpose for which the money is being collected—for distribution among the growers—seems to me quite illegal. The board had the power to protect the government by exacting the agreement; but I do not think it had the power to distribute as a gratuity to wool growers the moneys so realized from dealers, nor that Congress has power to authorize public moneys to be given away by the Bureau of Markets among a certain class having no legal claim on the government, and upon no fixed or stated principals of distribution. There is no debt due from the government to the wool growers; they have been paid the full agreed price for the goods they sold. What the board and its successor, the Bureau of Markets, propose to do, is to make them a present of government money. That the motives may be commendable and businesslike seems to me not sufficient to legalize such expenditure. This illegal purpose is not stated in the declaration, however, which merely follows the lines of the agreement, and seeks to recover from the defendant his profits above 5 per cent. for the use of the government. The objection is not, therefore, open on demurrer.

Demurrer overruled.

### Supplemental Opinion.

As stated in my opinion of August 23, 1922, which was withdrawn when the request for rehearing was granted, I was of the opinion that the defendant, in accepting a permit under the regulations promulgated by the War Industries Board, became bound by those regulations, in so far, at least, as they were within the power of the government to prescribe. Upon a careful re-examination of this point I see no sufficient reason to change the views upon it then expressed, and the opinion is refiled herewith.

[4] The rehearing was granted with special reference to the point referred to in the last paragraph of that opinion, viz. whether the purpose on the part of the government to distribute the money recovered from the defendant among wool growers was illegal, and, if so, whether such illegal purpose so entered into and affected the government's claim as to make it untenable on demurrer. The first regulations, as they stood when the defendant assented to them by accepting his permit, prescribed that "such gross profits shall be disposed of as the government decides." At that time they contained no provi-

sions as to the disposition of the excess profits received by the government. The defendant, by taking a permit, expressly agreed to abide by the then existing regulations and such valid regulations as might thereafter be adopted by the Wool Division of the War Industries Board.

Some months later, in August, 1918, all dealers were notified by the board that:

"As far as possible it [the excess profit paid to the government] is to be returned to the growers under the direction of the War Industries Board."

[5] The Appropriation Act of May 31, 1920, appropriated a certain sum to enable the Bureau of Markets of the Department of Agriculture—

"to continue as far as practicable the distribution among the growers of the wool clip of 1918 of all sums heretofore or hereafter collected or recovered with or without suit by the government from all persons, firms, or corporations which handled any part of the wool clip of 1918."

A provision expressly legalizing the regulations was struck out in the House on the ground, as stated by Representative Anderson during the debate, that:

"The House committee [of conference] felt that whatever rights the government had and whatever the private individuals had under those regulations were determined by the regulations themselves."

It is not contended by the plaintiff that the government was under any legal obligation to the growers; it plainly was not. And it does not seem to me that there was anything which could reasonably be thought to have created a moral or honorary obligation on the Government to them. They had not gone into business in reliance on any law or regulations made by it; they had the right to consign their wool for sale, in which case they got the full purchase price less only necessary expenses and a 4 per cent. commission, or to sell it outright to wool dealers at such price as they agreed to. They stood in the same position as persons in many other lines of industry who produced and sold merchandise part of which was needed for the use of the government in the prosecution of the war. Those who consigned their wool got the price fixed by the government; those who chose to sell outright got the price at which they sold. The distribution among them of public money is a pure gratuity, and nothing else. Neither the War Industries Board nor the Department of Agriculture have power so to deal with public money without a clear mandate from Congress for such action. I do not think such authority is to be found in the Appropriation Acts, either of 1919 or of 1920, which are relied on by the government. If the acts be construed as conferring such authority, they would, in my opinion, be unconstitutional.

[6] At the time when the defendant made his agreement with the government to pay to it his profits in excess of 5 per cent., he was not informed what was to be done with them. He understood only that they would have to be given up to the government. It does not seem to me that the plan for the disposal of such profits as might be received by the government, which was subsequently adopted, can affect

his liability or relieve him of his obligation. The money is not less due from him because administrative officers of the government into whose hands it will come may intend to use it in what I believe to be an illegal way.

The same result has been reached in an elaborate opinion by Judge Sater, of the Southern District of Ohio, in U. S. v. Gordin (unreported).

Demurrer overruled.