## UNITED STATES v. GORDIN.

(District Court, S. D. Ohio, W. D.   November 24, 1922.)

No. 74.

1. **War 4—Regulation limiting profits of dealers in wool valid.**

Under Act of June 3, 1916, establishing Council of National Defense, with authority to constitute subordinate agencies, the War Industries Board had authority to regulate prices of certain commodities, and the wool clip through the necessities of war being affected with a public interest, the regulations of such board as to the prices of wool and the profits of wool dealers were valid.

2. **War 14—President, as commander in chief, has broad powers to requisition material.**

In time of war the President, as commander in chief of military and naval forces, has comprehensive power to requisition and appropriate material, and when such action is taken every presumption favors the legality of his acts and the acts of his subordinates.

3. **War 4—Regulations limiting profits of wool dealers impliedly approved by congressional appropriation acts.**

Whether or not the Executive Department had express authority under Act June 3, 1916, establishing the Council of National Defense, through the War Industries Board, to regulate prices of wool and limit the profits of wool dealers, all question as to validity of such regulation was removed by the acts of July 24, 1919, of May 31, 1920, and of March 3, 1921, appropriating money to the Bureau of Markets, the successor of the War Industries Board, to carry on its activities.

4. **Constitutional law 48—Courts must presume legislative enactments were advisedly made.**

Courts presume that Congress, in enacting legislation, acts advisedly and with full knowledge.

5. **War 4—Appropriation statute impliedly approves regulations of board, notwithstanding elimination from the act of express approval.**

The elimination, from a proposed act of Congress, before passage, of a provision ratifying and confirming regulations of the Bureau of Markets, was not equivalent to a disapproval of such regulations; but the act appropriating money for the carrying on of the bureau's activities was in itself a ratification and approval of such regulations.

6. **United States 22—Congress may adopt and ratify acts of government agencies.**

Where an act originally purports to be done in the name and by the authority of the government, a defect in that authority may be cured by the subsequent adoption of such act by congressional enactment.

7. **War 4—Licensed dealer not entitled to retain profits in excess of regulation rate.**

The agreement of a dealer in wool licensed by the War Industries Board to operate, subject to its rules for handling the 1918 wool clip, was valid and enforceable, and where such wool dealer, in violation of his license and agreement, exacted a profit in excess of the authorized rate, such excess was recoverable from him in a suit by the United States.

8. **United States 135—Proper party to enforce contracts made by officers.**

Where a public officer, acting solely on behalf of his government, within the scope of his authority, enters into a contract, and his official character is known to the other party, a suit thereon must be brought in the name of the government, when redress is sought in its behalf.

9. **War ☞4—United States proper party to compel wool dealer to disgorge excessive profits.**

The United States was a proper party plaintiff to an action to compel a wool dealer licensed by the War Industries Board to pay over profits exacted by him in excess of the amount authorized by his license.

On Rehearing.

10. **Statutes ☞217—Debates of Congress, not to be considered in construing legislation.**

Debates in Congress are not appropriate sources of information from which to discover the meaning of the language of statutes passed by that body.

11. **War ☞4—Congressional appropriation to "enforce" regulations of Bureau of Markets as ratification of such rules.**

The appropriation of funds in successive years to enable the Bureau of Markets to enforce government regulations for handling the 1918 wool clip was an unmistakable ratification of the regulations of such bureau; "to enforce" meaning to put or keep in force; compel obedience to; cause to be executed or performed; as to enforce laws or rules.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Enforce.]

At Law. Suit by the United States against William H. Gordin to recover excess profits exacted by defendant, a wool dealer licensed by the War Industries Board. Defendant's demurrer overruled.

Thomas H. Morrow, U. S. Dist. Atty., of Cincinnati, Ohio.
Chase Stewart, of Springfield, Ohio, for defendant.

SATER, District Judge. Counsel have submitted on each side much matter of an historical character in connection with the arguments on the demurrer. To what extent it is evidential, and not such as may be judicially noted, is unimportant, as both sides desire its consideration in the determination of the points urged. No extended review of the same will be made.

Under the Act of June 3, 1916 (39 Stat. 166), there was established a Council of National Defense, with authority to constitute subordinate agencies and boards. One of the boards created by virtue of such authority was the War Industries Board. It was advisory to the Council of National Defense, and eventually became the personal agency of the President, from whom it obtained subsequently large powers. In 1918 it became apparent to the War and Navy departments and others immediately engaged in and responsible for the conduct of the war that the supply of wool would prove greatly inadequate to the needs of the army and navy and our civilian population. The wool obtainable could, of course, be acquired by commandeering. The government, through the War Industries Board, devised a scheme, however, through which the United States in effect took over the entire wool clip of that year, although the wool not needed in the prosecution of the war, and which could be applied to civilian use, was suffered to be diverted for such purpose. The price which the government fixed was to the grower based on the Atlantic seaboard price as established on July 30, 1917, less the profit allowed to the dealer,

and less freight to the Atlantic seaboard, moisture, shrinkage, and interest.

Regulations were promulgated controlling the purchase and disposition of wool. The regulations provided that country dealers should be allowed a profit of 1½ cents per pound on wool purchased by them, and that, if their gross profit for the season's business should be in excess of that sum, such "excess profit shall be disposed of as the government may decide." The dealers were licensed. On June 1, 1918, the defendant received from the wool division of the War Industries Board a permit to operate as an approved wool dealer in country districts, and agreed to operate subject to the rules for handling the wool clip of 1918 theretofore adopted by such board for the handling of fleece wools, which permit it was stipulated should be subject to immediate revocation for failure to comply with such regulations. His subsequent report to the government shows that he made a profit in excess of that prescribed by the regulations and which he had previously agreed to accept. The government sues to recover such excess. The defendant demurs to the petition.

[1] It has been held that given articles and property may, by virtue of circumstance, become clothed with a public interest, when used in a manner to make them of public concern and affect the community at large. Thus affected with a public interest are elevators or storehouses, where grain or other property is stored, Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Budd v. N. Y., 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Brass v. North Dakota ex rel. Stoeser, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757; the business of insurance, German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; irrigation, Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171; temporarily the renting of houses, Block v. Hirsh, 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus Brown Co. v. Feldman, 256 U. S. 170, 41 Sup. Ct. 465, 65 L. Ed. 877. In Lajoie v. Milliken, 136 N. E. 419, decided by the Supreme Judicial Court of Massachusetts, September 25, 1922, it was ruled that a state of war may affect with a public interest articles, such as coal, which under normal conditions are free to commerce in its usual channels, and thus render subject to governmental regulations that which would otherwise be unobstructed and unhindered by the law, and in such case the war powers of the federal government are at least as extensive as the police powers of the states. It must be held that during the war wool was affected with a public interest and became subject to government control. When it became established that the wool clip through the necessities of war became affected with such interest, the regulation of its price became one of the first forms in which such interest should be asserted. The validity of a regulation of that character has been settled since the decision of Munn v. Illinois was promulgated. Block v. Hirsh, 256 U. S. at page 157, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165. For an illustration of a price or rate regulation by a subdivision of the War Industries Board, see American Smelting & Refining Co. v. U. S.,

259 U. S. 75, 42 Sup. Ct. 420, 66 L. Ed. 833, decided by the United States Supreme Court, May 15, 1922.

[2] The regulations for the control of the wool clip of 1918 had their origin in the necessities of war. In time of war, by virtue of the Constitution and usually by standing statutory enactments of Congress, comprehensive powers reside in the President of the United States as commander-in-chief of the army and navy. As illustrative of his power, he may form temporary civil government in a conquered country and may impose duties on imports and tonnage for the support of the government and to sustain the burdens of war. See Cross v. Harrison, 16 How. 164, 190, 14 L. Ed. 889; Hamilton v. Dillin, 88 U. S. (21 Wall.) 78, 87, 88, 22 L. Ed. 528; Dooley v. U. S., 182 U. S. 222, 21 Sup. Ct. 762, 45 L. Ed. 1074; U. S. v. Heinszen & Co., 206 U. S. 370, 27 Sup. Ct. 742, 51 L. Ed. 1098, 11 Ann. Cas. 688. In proper cases and under proper circumstances property may be taken in time of war for defense or attack, for food or medicine for the army and navy, and for the transportation of troops and munitions of war. Clothing may be taken to supply the naval and military forces. U. S. v. Russell, 80 U. S. (13 Wall.) 623, 627, 628, 20 L. Ed. 474; Roxford Knitting Co. v. Moore & Tierney (C. C. A.) 265 Fed. at page 179, 11 A. L. R. 1415. If clothing may be thus appropriated, the materials, it would seem, out of which it is made, may also be taken, if the exigencies of war so require. When such action is taken, every presumption, as in other cases, is in favor of the legality of the acting officers, and, in the absence of evidence to the contrary, such presumption prevails. Lajoie v. Milliken, supra. The President of necessity is required to act largely through heads of departments and subordinates, and it was not required that the defendant's license should have been immediately issued or signed by the President. Roxford Knitting Co. v. Moore & Tierney, 265 Fed. 190, 11 A. L. R. 1415. The regulations governing the wool clip of 1918 and the permit issued to the defendant were, however, acts of the President, although prepared and executed by his chosen agents.

[3] It is urged in defense that the President and his subordinates were without authority to prescribe such regulations or to exact the license granted to and the contract made with the defendant. Much may be said to sustain the view that the broad powers vested in the President by the Constitution and congressional enactments conferred on him the right to control the wool clip in the manner in which it was done and to impart invalidity to the contracts made with country wool dealers; but whether he and his subordinates acted beyond his power is, however, immaterial in the light of subsequent legislation. It is clear that Congress could by appropriate legislation have conferred on him the authority to control the wool clip and to make such a contract as is here in question.

[4] The courts always presume that Congress acts advisedly and with full knowledge of the situation. The acquisition of such knowledge is not limited to the formal investigation of committees, nor are the courts at liberty to inquire how such knowledge was obtained. They must accept its action as that of a body having full power to

act, and only acting when it has acquired sufficient information to justify its action. Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 245, 22 Sup. Ct. 881, 46 L. Ed. 1144. It sufficiently appears that Congress was apprised of the action of the War Industries Board and did not by enactment confer broader powers, because those possessed were believed to be adequate for the course it was pursuing. It may also be assumed that the conflict in which the United States was engaged was of such paramount interest that members of the supreme legislative body were informed as to the steps taken to protect the army and navy and the civilian population. After the Armistice, as reflecting on the government's intent to take over the entire wool clip of the season, it may be noted that it continued to receive at the stipulated price all domestic wool which was on board of cars by December 31, 1918, a portion of which it was compelled to sell at a substantial loss. The activities of the War Industries Board were transferred to the Bureau of Markets, and to enable such bureau to complete the work of the domestic wool section of the War Industries Board a request for an appropriation of funds was made of proper committees of both the House and the Senate by the then Secretary of Agriculture. The Act of Congress approved July 24, 1919 (41 Stat. 267), making appropriations for the fiscal year 1920, contains the provision:

"To enable the Bureau of Markets to complete the work of the domestic wool section of the War Industries Board and to enforce the government regulations for handling the wool clip of 1918, as established by the wool division of said board, pursuant to the executive order dated December 31, 1918, transferring such work to the said bureau, $35,000."

A like provision, except as to amount, is found in the Act of May 31, 1920 (41 Stat. 725), making appropriation for the Department of Agriculture for the fiscal year 1921. On March 3, 1921 (41 Stat. 1343), another similar enactment appropriated $15,000 and directed that the Bureau of Markets—

"continue, as far as practicable, the distribution among the growers of the wool clip of 1918 of all sums heretofore or hereafter collected or recovered with or without suit by the government from all persons, firms, or corporations which handled any part of the wool clip of 1918."

[5] The contention is made that Congress did not ratify the action of the War Industries Board and therefore the defendant's contract, for the reason there was eliminated from the last-named act before its passage the language, "All said regulations are hereby legalized, ratified and confirmed as if they had been specially authorized and directed by prior acts of Congress," and the provisions adopted (excepting as to the distribution of sums collected) were made the same as in the two former appropriation acts. Such elimination, it is claimed, was a refusal to approve and legalize the board's activities touching the wool clip. Inasmuch, however, as Congress had previously, by necessary implication, at least, twice ratified and approved the action of the War Industries Board and directed the enforcement of its regulations, no specific legalization thereof was necessary. In Myerle v. U. S., 31 Ct. Cl. 105, it was held that a contract

repeatedly brought to the attention of Congress by the reports of a department, the validity of which is recognized by repeated appropriations, will be deemed to have been ratified. See, also, 39 Cyc. 734, note.

[6, 7] Where an act originally purports to be done in the name and by the authority of the government, a defect in that authority may be cured by the subsequent adoption of such act. Tiaco v. Forbes, 228 U. S. 549, 556, 33 Sup. Ct. 585, 57 L. Ed. 960. So long as an act is not legally void, but merely unlawful, it may be ratified (Mechem, Agency [2d Ed.] § 359; State v. Buttles, 3 Ohio St. 309), and the bringing of an action upon a contract amounts to a ratification, if such action is authorized, as in this case, by the Legislature (Page, contracts [2d Ed.] § 1867); but, having always had the power specially to authorize the regulations adopted by the War Industries Board and the contracts made in pursuance thereof, Congress could legally ratify the same. That it did so by its three several enactments appears from the rule announced in Myerle v. U. S. and U. S. v. Heinszen & Co., supra; Mattingly v. District of Columbia, 97 U. S. 689, 24 L. Ed. 1098; City of Findlay v. Pertz, 66 Fed. 427, 13 C. C. A. 559, 29 L. R. A. 188, C. C. A. 6; State v. Buttles, 3 Ohio St. 322, 323; New York Life Ins. Co. v. Board of Com'rs, 106 Fed. 123, 45 C. C. A. 233, C. C. A. 6; Santa Ana Water Co. v. Town of San Buenaventura (C. C.) 65 Fed. 323; State of Missouri v. Federal Lead Co. (D. C.) 265 Fed. 305. The legislative intent as expressed in all three of the appropriation acts can unmistakably be gathered from the context and background of common knowledge, and it is therefore as much a part of such acts as if it was all written out in the clearest words. Roxford Knitting Co. v. Moore & Tierney, pp. 191, 192. The conclusion above reached necessarily implies that the contract here in suit is valid and accords with the result obtained in U. S. v. Powers (D. C.) 274 Fed. 131, and the opinion of Judge Morton, rendered in U. S. v. Smith, 285 Fed. 751, on August 23, 1922, in the District Court of Massachusetts.

[8, 9] The contention that the United States is not the proper party plaintiff and that the action can be maintained only by the wool growers is without merit. If it should ultimately be held that the War Industries Board exceeded its authority in the making of the contract in question, the status of the parties to it by virtue of its ratification is the same as if power to enter into the engagement had originally been conferred. The rule is that where a public officer, acting solely on behalf of his government, within the scope of his authority, enters into a contract or performs any other official act, if his official character in the transaction is known presumptively or in fact to the other party, a suit thereon must be brought in the name of the government when the redress is sought in its behalf. Balcombe v. Northup, 9 Minn. 172 (Gil. 159, 163); 39 Cyc. 774, note; Bates, Pl., Pr. & Forms, 29; 17 Ency. Pl. & Pr. 146; Hodgson v. Dexter, 1 Cranch, 345, 363, 2 L. Ed. 130; Parks v. Ross, 52 U. S. (11 How.) 362, 13 L. Ed. 730. The contract contemplates the collection and disposition of the excess profits by the government, and

the last of the above-named appropriation acts expressly confers upon it the power to collect or recover the same, with or without suit.

The wool growers were not privy to the contract. The real and only parties to it are the plaintiff and the defendant, and, if the wool growers have an interest in it, such interest is represented by the government. The situation is as if A. owed B., and before suit was brought B. should declare and obligate himself that the fruits, if any, of the suit about to be filed, should be paid to third parties. The interest of such third parties would be contingent on the outcome of the suit, and they would not, therefore, be necessary parties. Barbour v. Whitlock, 4 T. B. Mon. (Ky.) 180, 181. If, in making the contract, the United States in fact acted in the capacity of either agent of the wool growers or as trustee for them, its right to maintain the action would still exist. If it was their agent, it nevertheless contracted in its own name with the defendant, who dealt with it alone knowing no other party in interest and agreeing to pay to it only (Bates, Pl., Pr. & Forms, 23); if it acted as their trustee or later became such, and should sue for the collection of the fund in its own name, its so doing would not be available as a defense (Bates, Pl., Pr. & Forms, 22). Their interest, if any, in the sum sought to be recovered, is not such under existing circumstances as need be passed upon until the suit is determined. Barbour v. Whitlock, supra.

Demurrer overruled.

### On Rehearing.

At the original hearing and in my former opinion emphasis was not placed on the fact (although it was mentioned in the brief of the government's counsel) that when the appropriation bill of July 24, 1919 (41 Stat. 267), was presented for consideration by the Senate, it contained the following provision:

"To enable the Bureau of Markets to complete work of the Domestic Wool Section of the War Industries Board and to enforce the government regulations for handling the wool clip of 1918 as established by the Wool Division of said board, pursuant to the executive order dated December 31, 1918, transferring such work to the said Bureau, $35,000. The activities to be undertaken under this appropriation shall include the securing and auditing of accounts and records of all dealers, the further collection of excess profits as provided in the regulations for handling the wool clip of 1918, and, so far as practicable, the distribution of such excess profits to the individual growers of the wool upon which such profits were made; necessary printing and the publication of the results of this work, including the names and addresses of dealers who have complied or who have failed or refused to comply with the rules and regulations for handling the wool clip of 1918."

As a result of the discussion which preceded the passage of the bill (see Congressional Record of June 17 and 18, pp. 1224–1226, 1278–1281), so much of the above-quoted passage as follows the figures "$35,000" was stricken out, after which the bill was enacted into a law. It was principally on account of the elimination mentioned that the rehearing was asked by the defendant, although the argument of counsel was not confined to that point; his contention being that such elimination betrayed a purpose on the part of Congress not to ratify the regulations theretofore made relating to the wool clip or the ac-

tion that had been taken thereunder. The insistence of the government is that the language stricken out was omitted because it was thought that, if such language remained in the bill, it would violate the rule which precludes the engrafting of general legislation upon an appropriation bill. The discussion found in the Congressional Record discloses that such was the reason for the omission.

[10] There is, however, a general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of the statutes passed by that body; the reason being that it is impossible to determine with certainty what construction was put upon an act by the members of the legislative body that passed it by resort to the speeches of its individual members. Those who did not speak may not have agreed with those who did, and those who spoke might differ from each other. U. S. v. Freight Association, 166 U. S. 290, 318, 17 Sup. Ct. 540, 41 L. Ed. 1007; District of Columbia v. Washington Market Co., 108 U. S. 243, 254, 2 Sup. Ct. 543, 27 L. Ed. 714; U. S. v. Union Pac. R. Co., 91 U. S. 72, 79, 23 L. Ed. 224; Aldridge v. Williams, 44 U. S. (3 How.) 9, 11 L. Ed. 469. The question as to the applicability of the rule just stated to the instant case need not be determined, for in all of the above cases it is held that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by resort to the history of the times when it was passed, and in State v. McCollister, 11 Ohio, 46, 55 (star pages), it was said that, only when there is a doubt as to the construction of a statute, resort may be had to extraneous matters, including the journals of the body by which it was enacted. As to the history of the times, nothing need be added to what was said by me on the original hearing. See, also, Judge Morton's opinion.

[11] As to the clarity of the appropriation act, it is free from uncertainty and ambiguity. It clearly shows that Congress recognized and approved the regulations made for the handling of the 1918 wool clip and the work that had been done in pursuance thereof, and that it desired its continuance until completion. The appropriation of $35,000 and also of funds in later years was made, not only to enable the Bureau of Markets to complete the work of the Domestic Wool section of the War Industries Board, but also to enforce the government's regulations for handling the wool clip in question. "To enforce" means "to put or keep in force; compel obedience to; cause to be executed or performed; as, to enforce laws or rules." Cent. Dict.; Tennant v. Kuhlemeier, 142 Iowa, 241, 120 N. W. at page 693, 19 Ann. Cas. 1026. There was an unmistakable ratification (if such were needed) of the regulations. In the original opinion, Meyerle v. U. S. was cited to sustain the view that Congress, by its repeated appropriations for the completion of the work and the enforcement of the regulations relating to the wool clip, had ratified such regulations, the contract made and the work done thereunder. Another pertinent case is Johnson v. U. S., 31 Ct. Cl. 262, from which it appears that federal officers entered upon private property and established a cemetery for the burial of the Confederate dead. There-

after Congress appropriated money to improve the cemetery. It was ruled. that such act must be regarded as authority for or ratification of the taking of the property and as showing an intent to hold it permanently.

The case has thus far been treated on the theory that, in the light of Congressional action, as found in appropriation bills, it is immaterial whether the contract made by the government with the defendant rested on power previously existing or previously and specifically conferred. My views, however, as regards the validity of the contract, are in harmony with those expressed by Judge Morton in U. S. v. Smith, 285 Fed. 751, and by Judge Sessions in U. S. v. Powers (D. C.) 274 Fed. 131.

I am still of the opinion that the demurrer should be overruled.