Campbell, Chief Justice,
delivered the opinion of the court:
In this case, and in two others heard with it, a company engaged in milling in 1917 and subsequently seeks to recover certain sums paid by such company to the United States Food Administration as representing profits taken by the company as a licensed miljer in excess of the 25 cents per barrel allowed by the regulations of the Food Administration. The petition seeks the recovery of $7,984.82, which the facts show is less than the profits, in excess of 25 cents per barrel actually received by the plaintiff. The amount *401 was arrived at in settlement, whereby certain concessions were made that reduced the amount to that stated. It ,is claimed that this amount was paid under protest and under duress. Conceding that there were profits in excess of those fixed by the regulations of the Food Administration; that plaintiff received these excess profit's, but- subsequently, on demand of the Food Administration, paid the same in the amount here sued for to the Food Administration, plaintiff’s contention is that the Government has never had or asserted any right or title in any profits made by millers in excess of 25 cents per barrel of wheat flour, and therefore that when, on demand of the Food Administration, plaintiff paid over the excess profits mentioned that were after-wards covered into the United States Treasury, an .implied contract arose whereby the Government should be held to have agreed to repay the same; and, further, that the fact that in making excess profits the plaintiff violated a regulation of the Food Administration does not affect its right to recover.
The Government takes issue with these contentions, but insists further that the payment made by plaintiff of excess profits was ,in compromise and settlement of a larger claim asserted against it, and, besides this, that the plaintiff used and was allowed the payment so made in reduction of its excess-profits taxes.
The authority for creating the United States Food Administration is to be found in the Lever Act, approved August 10, 1917, 40 Stat. 276, and frequently referred to as the “ food control act.” By virtue of that act the President issued on August 10, 1917, an Executive order establishing “ a governmental organization to be known as and called United States Food Administration.” He appointed Mr. Herbert Hoover United States Food Administrator, “ authorizing him to have subordinate assistants and employees,” and conferred upon him the powers and authority given by the act mentioned, “ so far as the same apply to foods, feeds, and their derivative products,” including the issuance, regulation, and revocation of licenses under the said act. By proclamation dated August 14, 1917 (40 Stat. 1689), the *402 President announced it to be essential to license the storage and distribution of wheat and the manufacture, storage, and distribution of all products derived therefrom, and required millers to secure licenses. On August 21, 1917, the plaintiff made its application for license, addressed to the Food Administrator upon the prescribed form, applying therein “ for a license to manufacture and distribute wheat and rye and their derivative products.” The applicant agreed “ that, in consideration of the issuance to it of the license ” applied for, it would conduct its business in accordance with and would obey the rules and regulations which had been or would be prescribed by the President or by the Food Administrator under the provisions of the Lever Act of August 10, 1917. Under date of August 25, 1917, the plaintiff executed an agreement in writing “ to observe the rules and regulations enacted or promulgated by the said Food Administrator for the government of the milling trade under date of the 24 day of August, 1917, and any modification thereof that may be made with the approval of the committee named in such regulations.” The Food Administration issued on August 24, 1917, its rules and regulations for the flour-milling industry, calling attention to the provisions of section 5 of the Lever Act and giving notice that until terminated by 30 days’ notice an average maximum profit which could be taken upon the business of milling flour would be 25 cents per barrel. There were also issued on August 24,1917, rules and regulations governing flour millers “ operating under agreement with the United States Food Administration,” which provided that no miller should take any profits upon the business of milling flour in excess of 25 cents, per barrel, and declared that any profits in excess of that amount were determined “to be unjust and unreasonable.” Each miller was required to make a return under bath to the United States Food Administrator before the 18th day of each month, showing the profits earned during the preceding calendar month. Following the application therefor, a license was duly issued to the plaintiff to manufacture and distribute wheat and rye and their derivative products, and thereafter the plaintiff submitted its monthly reports. These disclosed profits in excess of 25 cents per barrel of flour, and *403 after the close of tbe food-control period its books were examined by auditors of the Food Administration, whose report disclosed excess profits of over nineteen thousand dollars. Afterwards an adjustment was arrived at by representatives of the Food Administration and of the plaintiff, with the result that the plaintiff paid over the sum of $7,984.82 in settlement. There were issued to plaintiff certificates, as provided for in the regulations, showing that it had liquidated excess profits to the amount of $7,984.82, which certificates were filed by plaintiff with the Bureau of Internal Bevenue for a refund — and it received a refund— of excess-profits taxes based upon a deduction from income of the amount of these certificates. The money received by the Food Administration from the plaintiff was covered into the United States Treasury.
The right during the war to control the profits of the miller, so far as wheat and its products are concerned, may be well sustained as an exercise of the war powers of the Government. The Lever Act authorized the action that was taken by the President and the Food Administration. The plaintiff not only agreed to abide by the rules and regulations of the Food Administration, but it secured a license to carry on its business upon condition that it would abide by them. These rules and regulations were authorized and necessary to carry out the powers conferred on the President by the act. If any doubt could be cast upon Mr. Hoover’s authority and power to issue the rules and regulations (and we think there can be no doubt) it is sufficient to say that all acts done and authorized by him were “ authorized, approved, ratified, confirmed, and adopted ” by the President’s proclamation of November 21, 1919 (41 Stat. 1774), appointing his successor. There is no contention that the profits allowable by the regulations were unreasonable, the contention going to the plaintiff’s right to withhold the additional profits which in fact were paid over by it. But if the licensee of the Food Administration could take more profits than 25 cents per barrel of flour, without being accountable for the excess, it is manifest that the purpose of the act could be easily defeated. The regulations were intended to carry into effect the provisions of the act, not *404 to afford a method by which its provisions could be evaded. Under the facts stated the plaintiff was not entitled to have the excess profits, and it had no right to violate the regulations or its own agreement. The right of the Government to recover excess profits from a wool dealer was sustained in United States v. Smith, 285 Fed. 751, United States v. Gordin, 287 Fed. 565. See also United States v. Powers, 274 Fed. 131. The present case is stronger for the Government than these cases, because the licensee is here- suing, after having paid to the Food Administration the excess profits, or that part of them agreed upon between the parties as being the proper amount, and having paid them and received certificates showing the payment, it used those same certificates to secure a reduction of its taxes. This court said in Cheyenne Milling Co. case, 59 C. Cls. 927, a case somewhat similar in its facts to the present one, that “ the settlement was made with full knowledge on the part of the plaintiff of every step taken and of every item which entered into the settlement.” We might very well treat the settlement made in the instant case as a closed transaction, as was done in the case just cited. If the plaintiff wished to contest .the Government’s right to receive the excess profits, it should have refused to make the settlement. Apparently, it preferred to take its chances on reducing the Government’s demand. It succeeded in securing a reduction from an amount exceeding $19,000 to the amount now claimed, about $7,900.
It is not claimed, and can not be, that there was any express contract to return to plaintiff the amount of the payment. The reliance is upon an implied contract, which it is urged grows out of the receipt of the money in the circumstances of the case. It is well settled, however, that an implied contract to be effective against the Government in this court must be one implied in fact, as distinguished from one that may in some instances arise by implication of law. “An implied contract, in order to give the Court of Claims, or a district court, under the Tucker Act, jurisdiction to give judgment against the Government, must be one implied in fact and not one based merely on equitable *405 consideration and implied in law.” United States v. Minnesota Investment Co., 271 U. S. 212, 217. In another case, United States v. Gettinger, 272 U. S. 734, the plaintiff sued to .recover the amount of a fine imposed under a statute afterwards declared unconstitutional, .it appearing that in paying the amount of the fine the party had sought to reserve the right to reclaim it if the statute were declared unconstitutional. The Supreme Court, speaking through Mr. Justice McReynolcls, said (p. 735) :
“ The attempt by plaintiffs in error to reserve rights if the Lever Act should be held unconstitutional amounted at most to a protest, possibly sufficient to overcome the suggestion of an estoppel, but no contract arose out of it which obligated the United States to return the fine. Neither the court nor any Federal officer had authority to make such an agreement.” It was accordingly held that the lower court was without jurisdiction and should have dismissed plaintiff’s complaint. In United States v. Holland-American Line, 254 U. S. 148, a suit had been brought in the Court of Claims to recover from the Government certain payments alleged to have been exacted under duress and without warrant of law.- The Supreme Court say (p. 155) that the claim presented sounded in tort “ and was in substance an action to recover for the wrongful acts of the United States officials in compelling the claimant to pay under duress and without authority of law the sums sued for. Following the well-established construction of the Tucker Act, as declared in many cases in this court, we think that the Court of Claims should have dismissed the petition because it presented a claim not within its jurisdiction.” If, therefore, it were conceded (though it is not conceded) that the payment to the Food Administration was wrongfully exacted or made under duress, there could be no recovery in this court. No facts are shown from which an implied contract would arise that the Food Administration or its agencies agreed that the payments would be refunded, even if they had authority to bind the Government in that regard. Nor is there any merit in plaintiff’s contention that the claim is one founded on a law of Congress. There is nothing in the act requiring the *406 moneys to be refunded in any event or by anyone. See Ludington ease, 15 C. Cls. 453; Missouri Pacific R. R. Co, case, 59 C. Cls. 524, 532.
Our conclusion is the petition should be dismissed, and it is so ordered.
Moss, Judge; Graham, Judge; and Booth, Judge, concur.