**Ex parte ZIMMERMAN.**

**ZIMMERMAN v. WALKER, Captain U. S. Army, Asst. Dist. Provost Marshal for Dist. of Hawaii.**

**No. 10093.**

Circuit Court of Appeals, Ninth Circuit.

Dec. 14, 1942.

Frank E. Thompson and Charles F. Parsons, both of Honolulu, T. H., and E. Coke Hill, of San Francisco, Cal., for appellant.

Charles Fahy, Sol. Gen., Dept. of Justice, and Mryon C. Cramer, Major General, The Judge Advocate General, U. S. Army, both of Washington, D. C. (Edward J. Ennis, Atty. War Division, Dept. of Justice, of New York City, Archibald King, Colonel, Judge Advocate General's Dept., U. S. Army, of Washington, D. C., Angus M. Taylor, Jr., U. S. Atty., and Jean Vaughn Gilbert, Asst. U. S. Atty., both of Honolulu, T. H., and Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., of counsel), for appellee.

A. L. Wirin, of Los Angeles, Cal. (Arthur Garfield Hays and Osmond K. Fraenkel, both of New York City, Wayne M. Collins, of San Francisco, Cal., Clarence E. Rust, of Oakland, Cal., and E. W. Camp and Fred Okrand, both of Los Angeles, Cal., of counsel), for American Civil Liberties Union as amicus curiae.

Earl Warren, Atty. Gen., State of California, and Herbert E. Wenig, Deputy Atty. Gen., for State of California, as amicus curiae.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appeal is from a judgment of the United States District Court for the Territory of Hawaii denying a petition for a writ of habeas corpus.

Appellant is the wife of Hans Zimmerman. On February 19, 1942, she filed the petition on Zimmerman's behalf alleging that he is unlawfully detained and imprisoned by color of the authority of the United States in the custody of Captain Walker of the United States Army, Assistant Provost Marshal in Honolulu. The petition came on for hearing February 20, at which time the court declined to issue the writ.

The petitioner alleged that both she and Hans Zimmerman are citizens of the United States and residents of Honolulu; that "the cause or pretext" of the detention of Zimmerman "is a certain order or decision made and entered by an alleged Board of Officers and Civilians appointed by the authorities of the United States for the purpose of inquiring into the activities of persons resident within the United States to ascertain whether or not such activities are subversive to the best interests of the United States and as to their loyalty or disloyalty to the United States and to recommend the detention or parole after inquiry, of such persons; and your petitioner is informed and believes and therefore alleges the fact to be that by virtue of a decision or order of the alleged Board so appointed as aforesaid, the authorities of the United States, acting through the United States Army, are about to remove the interned beyond the jurisdiction of this Honorable Court and to take him to some other place on the Mainland of the United States unknown to your petitioner and to the said interned."

The petition alleged further that the detention is in violation of the constitution of the United States in that there is no legal cause for the removal of the interned from the jurisdiction; that the removal was ordered and the interned held in custody without authority of law in that the interned was denied the right of trial by jury and in that the Board predicated its decision and order "upon statements and testimony of an irrelevant and hearsay nature" taken in the absence of the interned, and that the testimony was wholly insufficient to warrant the Board's decision; that the decision "is null and void in that said Board was not lawfully constituted, appointed and functioning for the purpose of depriving or with authority to deprive citizens of the United States of their constitutional rights of freedom and of being charged, tried and confronted by witnesses without the right to examine or cross-examine said witnesses as to the commission of any acts by such citizens subversive to the United States." There are allegations to the effect that the interned was not permitted to cross-examine witnesses, was denied the right to see reports and statements which had been brought to the attention of the Board, and was permitted "only in a limited and unreasonable manner" to examine witnesses called on his own behalf; that he was without counsel at the hearing and was advised by Captain Walker that counsel was neither necessary nor desirable, when in fact the hearing was beyond the intelligent comprehension of any lay person.

At the hearing of the petition no evidence was taken and no return required or made. The judge stated that he had read the petition, that in his opinion it "was well grounded and justified the issuance of a writ," but that he felt powerless to direct its issuance in view of Order No. 57 of the

military governor,[1] and that "the court is under duress by reason of the order." He closed by stating that the writ was denied "upon the sole ground that the court is forbidden to issue a writ of habeas corpus." Judgment was entered accordingly.

Apart from the reasoning of the judge, we may say at once that in our opinion the denial of the writ was proper. The averments of the petition plus facts of which the court has judicial knowledge required that action.

On the morning of December 7, 1941, the Hawaiian Islands were attacked and invaded by the military and naval forces of Japan.[2] In the forenoon of that day Governor Poindexter of the Territory, acting under authority of Section 5(a) of Act 24 of the Laws of the Special Session of the Territorial legislature of 1941,[3] declared the existence of a defense period throughout the Territory. During the afternoon of the 7th, pursuant to Section 67 of the Hawaiian Organic Act, 48 U.S.C.A. § 532, the governor issued a proclamation placing the Territory under martial law and suspending the privilege of the writ of habeas corpus until further notice.[4] His action in this respect was immediately communicated to and approved by the President.[5]

The Governor's proclamation called upon the commanding general of the Hawaiian Department (General Short) to prevent the invasion and to exercise all powers normally exercised by the civil governor. It further authorized the commanding general "during the present emergency and until the danger of invasion is removed, to exercise the powers normally exercised by judicial officers and employees" of the Territory, and such other powers as the emergency might require. In compliance, General Short at once publicly assumed the position of military governor; and when, ten days later, General Short was relieved of his command, his successor, General Emmons, assumed the post of military governor and by proclamation confirmed the orders and other actions taken by his predecessor. On December 7 the military governor had by General Orders No. 4 established a military commission and provost courts with power to try and determine cases involving offenses committed by civilians against the laws of the United States or of the Territory, or the regulations, orders, or policies of the military. All other courts had thereupon been closed by order of the commanding general. As indicated in note 1 above, the civil courts were later authorized to resume their functions to a limited extent as agencies of the military governor; but otherwise the conditions of martial rule as well as the suspension of the writ continued without interruption.

It is complained that Governor Poindexter entirely abdicated his functions, and there is criticism of the orders, including General Orders No. 57, suspending or con-

---

[1] General Orders No. 57 of the military governor were issued January 27, 1942. Among other things, these regulations authorized the limited resumption of the operations of the civil courts in the Territory which had earlier been suspended pursuant to the proclamation of martial law. They continued in force, however, the prohibition of the issuance of the writ of habeas corpus.

[2] See Report of Roberts Commission, page 15, Senate Doc. No. 159, 77th Cong., 2nd Sess.

[3] "Whenever there exists (1) any state of affairs or circumstances arising out of an invasion, attack, insurrection, rebellion, or lawless violence, or any danger or threat thereof, or (2) any state of affairs or circumstances making it advisable to protect the Territory and its inhabitants, of the existence of any of which the Governor shall be the sole judge, the Governor, by proclamation, may declare a defense period to exist. A defense period may be declared for any one or more counties, or a part of a county, and when once declared shall continue until the Governor, by proclamation, shall declare the defense period at an end. Such proclamations shall be promulgated by publication thereof, or by posting copies of the same in at least ten public places in each county, or part thereof, affected by any such defense period, or, when immediate promulgation is necessary in the opinion of the Governor, who shall be the sole judge thereof, by official announcement thereof by him by means of radio broadcast."

[4] The proclamation declared that the armed forces of Japan "have this day attacked and invaded the shores of the Hawaiian Islands," that "it has become necessary to repel such attack and invasion," and that "the public safety requires" the action taken.

[5] The executive order was published in the Federal Register. As to the effect of such filing as notice, see Sec. 7 of the Federal Register Act of 1935, 44 U.S.C.A. § 307.

tinuing in part the suspension of the activities of the civil courts. But questions relating to these matters are not before us and in respect of them we express no opinion. The inquiry here concerns only the legality of the suspension of the privilege of the writ of habeas corpus as related to this petitioner.

The constitution of the United States (Art. I, Sec. 9, Cl. 2) provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Section 67 of the Act of Congress of April 30, 1900 (the Organic Act of Hawaii) authorizes the governor "in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it," to suspend the privilege of the writ, or to place the Territory under martial law until communication can be had with the President and his decision made known.[6] We note in passing that the constitution of the Republic of Hawaii (Sec. 31) had clothed the president of the Republic with these same powers.[7]

■■■ As has been observed, it is history that the Islands were invaded on December 7. Such being the case, Governor Poindexter's suspension "until further notice" of the privilege of the writ, with the approval of the President, was authorized by the constitution and by specific act of congress.[8] The emergency inspiring the proclamation did not terminate with the attack on Pearl Harbor. The courts judicially know that the Islands, in common with the whole Pacific area of the United States, have continued in a state of the gravest emergency;[9] and that the imminent threat of a resumption of the invasion persisted. In the months following the 7th of December the mainland of the Pacific coast was subjected to attacks from the sea. Certain of the Aleutian Islands were invaded and occupied. And as late as the early summer of 1942 formidable air and naval forces of Japan were turned back at Midway from an enterprise which appeared to have Hawaii as its ultimate objective.

But it is contended that the writ should have been issued and the respondent required to set forth in a return the military necessity for the action taken in order to establish the proper procedural basis for a decision. Counsel argue that while the privilege of the writ may be suspended in appropriate circumstances, the writ itself may not. They rely in this respect on language of the court in Ex parte Milligan, 4 Wall. 2, 130, 131, 18 L.Ed. 281, to the effect that "the suspension of the privilege of the writ of habeas corpus does not suspend the writ itself. The writ issues as a matter of course; and on the return made to it the court decides whether the party applying is denied the right of proceeding any further with it."

■■■ It is little to the purpose to attempt here an analysis of distinctions between suspension of the privilege and suspension of the writ. Whether the writ will be awarded in any particular case depends on the showing made. The statute, 28 U.S. C.A. § 455, provides that the writ shall be awarded "unless it appears from the petition itself that the party is not entitled thereto." And see Walker v. Johnston, 312 U.S. 275, 283, 284, 61 S.Ct. 574, 85 L.Ed. 830; United States ex rel. Quirin v. Cox, October 29, 1942, 63 S.Ct. 2, 87 L.Ed. ——. The writ ought not to be awarded if the court, upon examination of the petition, is satisfied that the petitioner would be remanded to custody. Ex parte Watkins, 3 Pet. 193, 201, 7 L.Ed. 650. In this case the petition and facts of which the court was required to take judicial cognizance were

---

[6] "The governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii within the said Territory, and whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse commitatus, or call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory, and he may, in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus, or place the Territory or any part thereof, under martial law until communication can be had with the President and his decision thereon made known." 31 Stat. 153, § 67, 48 U.S.C.A. § 532.

[7] See Archibald King, "The Legality of Martial Law in Hawaii," 30 Cal.Law Rev. 371.

[8] Ex parte Milligan, 4 Wall. 2, 125, 126, 18 L.Ed. 281.

[9] Givens v. Zerbst, 255 U.S. 11, 18, 41 S.Ct. 227, 65 L.Ed. 475; United States v. Hamburg-Amerikanische, etc., Co., 239 U.S. 466, 475, 36 S.Ct. 212, 60 L.Ed. 387; Hamilton v. Dillin, 21 Wall. 73, 88 U.S. 73, 90, 22 L.Ed. 528.

together to be considered as constituting the application, Walker v. Johnston, supra, 312 U.S. page 284, 61 S.Ct. 574, 85 L.Ed. 830.

It was not made to appear in the petition that Zimmerman had been charged with any crime or that sentence had been imposed upon him; rather, that he was being held or detained by the military authorities. The cause of his detention was alleged to be a decision of a Board of officers and civilians appointed by the authorities of the United States to recommend the detention or parole of persons resident within the United States, after inquiry to ascertain whether their activities are subversive to the best interests of the United States and whether they are loyal or disloyal. The petition did not assert that the actual cause of the detention was unrelated to such an inquiry, or that the inquiry was undertaken or the decision made in bad faith, or that the authority of the Board was used to bring about the detention of the petitioner as a means of furthering private interest or personal spite. Had a showing of such sinister nature been made it appears to us that the respondent ought to have been required to show cause for the detention in order that the court might be in position to determine whether the action was purely arbitrary, Sterling v. Constantin, 287 U.S. 378, 401, 53 S.Ct. 190, 77 L.Ed. 375. But taken by its four corners the petition discloses that Zimmerman was being subjected to detention by the military authorities after an inquiry related in some way to the public safety, in an area where martial law was in force and the privilege of the writ had been lawfully suspended. The futility of further inquiry was apparent on the face of the petition.

The allegations that Zimmerman had been denied his constitutional right of trial by jury, of being confronted with the witnesses against him, and of having counsel to represent him, were purely argumentative and are without force. They tendered no material issue of fact.[10] The same is true of the allegation that the Board was not lawfully constituted "for the purpose of depriving or with authority to deprive citizens of the United States of

their constitutional rights," etc. This is not an averment that the Board was not regularly constituted for the purpose for which, as shown elsewhere in the petition, it had been set up by the military, namely, to recommend, after inquiry, the detention or parole of suspected persons. It is true that the averments of petitions for this great writ are not scrutinized with technical nicety; but neither are they taken as importing something other than what they say. The courts, in circumstances like the present, ought to be careful to avoid idle or captious interference.

The petition, then, was to be considered in its setting, and its sufficiency gauged in the light of the unprecedented conditions under which present day warfare is waged. It is common knowledge that the Hawaiian Islands, owing to their position and the inclusion in their population of so large an element presumptively alien in sympathy, are peculiarly exposed to fifth-column activities. In such an exigency, a prime purpose of the suspension of the writ is to enable the executive, as a precautionary measure, to detain without interference persons suspected of harboring designs harmful to the public safety.

The civil courts are ill adapted to cope with an emergency of this kind. As a rule they proceed only upon formal charges. Their province is to determine questions of guilt or innocence of crimes already committed. In this respect their functions are punitive, not preventive; whereas the purpose of the detention of suspected persons in critical military areas in time of war is to forestall injury and to prevent the commission of acts helpful to the enemy. It is settled that the detention by the military authorities of persons engaged in disloyal conduct or suspected of disloyalty is lawful in areas where conditions warranting martial · rule prevail.[11] Measures like these are essential at times if our national life is to be preserved. Where taken in the genuine interest of the public safety they are not without, but within, the framework of the constitution.

Affirmed.

---

[10] Ex parte Cuddy, 131 U.S. 280, 9 S.Ct. 703, 33 L.Ed. 154; Craemer v. State, 168 U.S. 124, 18 S.Ct. 1, 42 L. Ed. 407.

[11] Ex parte Milligan, supra, 4 Wall. page 125, 18 L.Ed. 281; Moyer v. Pea-

body, 212 U.S. 78, 84, 85, 29 S.Ct. 235, 53 L.Ed. 410. Consult Fairman, The Law of Martial Rule and the National Emergency, Harvard Law Rev. Vol. LV, No. 8, page 1253.

HANEY, Circuit Judge (dissenting).

Since this case involves a conflict regarding the respective spheres of authority of the civil and military officers, it is necessary to consider various subjects in the determination thereof.

*Suspension of Civil Laws.* The English Bill of Rights, December 16, 1689, declared:

"1. That the pretended Power of suspending Laws, or the Execution of Laws, by regal authority, without consent of Parliament, is illegal.

· "2. That the pretended Power of dispensing with Laws, or the execution of Laws, by regal Authority, as it hath been assumed and exercised of late, is illegal * * *."

The Declaration of Independence, July 4, 1776, indicted the King—"For taking away our Charters, abolishing our most valuable Laws, and altering fundamentally the Forms of our Government: For suspending our own Legislature, and declaring themselves invested with Power to legislate for us in all cases whatsoever. * * *"

In view of the abuses well known in the colonies, it is not surprising that prohibition against their recurrence found their way in the state constitutions adopted prior to the federal constitution. Of the thirteen original states, Connecticut and Rhode Island had no constitutions. Of the remaining eleven, Maryland, Massachusetts, New Hampshire, North Carolina, and Virginia expressly prohibited suspension of the laws by anyone but the legislature. Vermont in its constitution of 1786 had a like prohibition. It was probably impliedly included in the other constitutions.

As a result of the previous history it was only natural that the question should receive treatment in the Constitution. Article 1, Section 1, provides that "all legislative Powers herein granted shall be vested in a Congress of the United States * * *." The action of suspending a law being a legislative power, a law can be suspended only by Congress or pursuant to its authority.

*Authority Over the Army.* In early times, the army was an arm of the King under the latter's exclusive control, excepting in cases of mutiny. In paragraph VI of the Petition of Right, June 7, 1628, it was complained that "great Companies of Soldiers and Mariners have been dispersed into divers Counties of the Realm * * *

against the Laws and Customs of this Realm". The English Bill of Rights, December 16, 1789, declared "That the raising or keeping a Standing Army within the Kingdom in Time of Peace, unless it be with Consent of Parliament is against Law".

In the Constitutions of the original states, seven contained express provisions to the effect that the military was under subordination to the civil power. All such provisions were similar to the one in the Maryland Constitution (1776), "That in all cases, and at all times, the military ought to be under strict subordination to and control of the civil power". Declaration of Rights § 27. The Delaware, Georgia, New Jersey and New York Constitutions had no express provisions. In addition to the other seven constitutions, the Vermont Constitution (1793) also had the subordinating provision. Part 1, art. 16.

The Constitution empowered Congress "To raise and support Armies" and "To make Rules for the Government and Regulation of the land and naval Forces". Article 1, § 8, cls. 12, 14. There can be little question but that the army is subordinate to the law. Dow v. Johnson, 100 U.S. 158, 169, 25 L.Ed. 632; Davis, A Treatise on the Military Law of The United States (3rd Ed.Rev.) 325.

*Martial Law.* It is the view of some, that the army, by a declaration of martial law, could by that simple expedient, deprive all people under its control of all liberties, whether personal or inalienable, or not. That view grows out of a confusion of terms and meaning brought about by modern writers. Winthrop's, Military Law and Precedents (2d Ed.), 1274; Corwin, Martial Law, Yesterday and Today (1932), 47 Pol.Sc.Quart. 95; Fairman, The Law of Martial Rule and The National Emergency (1942), 55 Harv.L.Rev. 1253, 1257-1259. To be understandable at all, its history must be traced.

For its meaning at the time the Constitution was adopted, 14 Encyc. Britannica (14th Ed.) 984, states as follows:

"Much of the confusion and doubt about its meaning and the powers exercisable in its name would have been avoided if modern writers had been careful to confine the term to its original meaning as used by Hale and Coke, namely, the law applied to the army and nothing else, the law known as 'military law'. Modern writers have appropriated the term 'Martial Law' to the

assumption or arbitrary powers by the Executive, in time of civil disturbances, over civilians, and have then proceeded to real earlier authorities by the light of its rays. The result is to darken their counsel and beget a gross anachronism. Hale (History of the Common Law, pp. 36-42) says of martial laws that 'the necessity of good order and discipline in the army is that only which can give these laws countenance.' He accordingly held that it could not apply to civilians in any circumstances.

"The term was used in the same sense as Hale uses it in the famous Petition of Right, which forbade martial law in time of peace. The 'Petition' did not thereby, either expressly or impliedly, legalize it in time of war. The contemporary debates in the House of Commons show that the men of those days did not contemplate the legality of martial law as applied to civilians, under any circumstances. In objecting to martial law they were objecting to commissions issued by the king to try civilians as though they were soldiers subject to military law and triable by court martial. As for soldiers themselves, the contemporary view was that at common law, even they were not, in time of peace, subject to martial law, i. e., to military law, except by a statute (a view which now finds countenance in the necessity of the annual Army Act), although in the field, in time of war, they were so subject. Or to put it another way, martial law was pure military law, and as such unknown to the common law, and only came into existence with the outbreak of war and even then was confined to troops.

"Cockburn, C. J., was unquestionably right in holding (see his observations in the Queen v. Nelson, Finlasson's edition, p. 66) that the Petition of Right condemned the exercise of martial law against the subject 'under any circumstances,' whether in 'war' or in 'peace', and even as against soldiers except in the case of armies in time of war. The promoters of the Petition of Right were solely concerned to assert the supremacy of the common law. Even a rebel, they argued, taken with arms in his hands, had a right to be tried by the ordinary common law courts. If he could not be so tried, the law was then altogether suspended. They did not trouble themselves with the question with which modern lawyers are so greatly vexed, namely, as to whether there could exist a kind of qualified 'state of war' under which the courts might still be sitting, but in circumstances of military indulgence such as would bind them not to interfere. This modern view has helped to give a colour of legality to martial law which would have been incomprehensible to the Stuart generation, denying as they did, the very existence of the thing except within the determinate limits of military law."

That such was the view in the colonies is borne out by various state constitutions adopted prior to the Constitution. Thus the Maryland Constitution (1776) provided: "XXIX. That no person, except regular soldiers, mariners, and marines in the service of this State, or militia, when in actual service, ought in any case to be subject to or punishable by martial law." Declaration of Rights, § 29. Vermont had a similar provision. Const.1786, c. 1, art. 19. Massachusetts and New. Hampshire had similar provisions except that at the end of the provision quoted, there was added "but by authority of the legislature". Const.Mass.1780, Pt. 1, art. 28; Const.N.H. 1784, Pt. 1, art. 34.

The kind of martial law then known was what we now refer to as "military law" and was expressly recognized by Article 1, Section 8 of the Constitution which authorizes Congress "To make Rules for the Government and Regulation of the land and naval Forces", Clause 14 (such provision being taken from Art. IX, Articles of Confederation, 2 Farrand, Records of the Federal Convention 330) and "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States". Clause 16. The Articles of War, 10 U.S.C.A. § 1471 et seq., were the statutory exercise of these powers.

*Military Government.* As can be seen "martial law" meant, when the Constitution was adopted, "military law". Subsequently, it began to be used synonymously with "military government". For example, see 1 Cooley's Blackstone 349, n. 3. Davis, supra, 304, n. 1, explains military government as follows: "Martial law is a modified degree of the law of war, or a law assimilated to the latter, called into exercise temporarily and for a specific purpose, at a time of war or public emergency, and generally in a place or region not constituting enemy's country, or under permanent military government. Whether proclaimed by the President or declared by a competent military commander, martial law overrides and supersedes, for the time being, all civil

law and authority, except in so far as the same may be left operative by the terms of the announcement, or the action or acquiescence of the dominant power. While the status of martial law continues, the military power, instead of being subordinate, is superior to the civil power, and the natural and normal condition of things is reversed * * *."

It is more tersely described in 14 Encyc. Britannica (14th Ed.) 984, as follows: "The truth of the matter is that the term martial law is really an anachronism and legally means nothing at all. Martial law is simply, as Fitzjames Stephen put it, 'the assumption by the officers of the Crown of absolute power exercised by military force for the suppression of an insurrection and the restoration of order and lawful authority.' * * *"

In reading the authorities, care should be taken to determine in what sense "martial law" is used.

Military government is not expressly recognized in the Constitution and is wholly and entirely contrary to the form of government provided for therein. Davis, supra, 305. "Martial law is not provided for in the U. S. Constitution, except by inference, but is rather a means of preserving the Constitution. It is the law of necessity and asserts itself". 14 Encyc. Britannica, 14th Ed., 986. See also: Davis, supra, 304; Winthrop, supra, 1279; Corwin, supra, 97; Underhill, Jurisdiction of Military Tribunals in The United States over Civilians (1924), 12 Cal.L.Rev. 75, 159, 177-178. "A mere 'proclamation' of martial law by the Crown has, of itself, no legal validity whatsoever. A Proclamation is not necessary to justify resort to martial law nor is the resort to martial law justified by it". 14 Brit., supra, 985. See also: Davis, supra, 304; Corwin, supra, 97; Underhill, supra, 172. Probably the only legal effect of such a proclamation is psychological. Government by a commanding officer is of course not government by executive, legislative and judicial branches, the kind of government provided for in the Constitution.

In considering the extent to which military government is recognized here, since the army is an arm of the executive, we may refer, first to executive powers. Art. II, Sec. 2, provides that "The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States". Art. II, Sec. 3 provides that the President "shall take Care that the Laws be faithfully executed". Nothing in those provisions expressly authorizes the President to impose military government anywhere. Winthrop, supra, 1294.

Respecting the legislative powers, there are several provisions having a bearing on the question. Art. I, Sec. 8, provides, among other things:

"The Congress shall have Power To Lay and collect Taxes, Duties, Imposts and Excises, to * * * provide for the common Defence and general Welfare of the United States * * *

"To declare war * * *;

"To raise and support Armies * * *;

"To provide and maintain a Navy * * *;

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions * * *;

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the government of the United States, or in any Department or Officer thereof."

None of these provisions authorizes Congress to establish a military government anywhere.

One of the provisions does authorize Congress to provide for calling forth the Militia to (1) "execute the Laws of the Union"; (2) "suppress Insurrections"; and (3) "repel Invasions". Examples of the exercise of this power may be found in 18 U.S.C.A. § 26; 32 U.S.C.A. § 81a; and 50 U.S.C.A. § 201, 202. However, calling forth the militia, and the imposition of a military government are two different things. The former finds express sanction in the Constitution—the latter none. The conclusion is clear from the history of the times and the then prevailing view of the people as previously herein shown. In view of the long struggle to obtain recognition of the right of the people to govern, it is inconceivable that they would have given up the struggle after they had been successful in compelling recognition of the principle.

However, from the provisions of the Constitution and Art. IV, Sec. 4 which provides that the United States "shall protect each of them [i. e. the states] against Invasion" several inferences may be made. The first is that since Congress is expressly

authorized to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" the militia, when called for one of such purposes, has power to do all that is necessary to accomplish those purposes. If the situation is such that the civil government cannot function, the army rules until such government can be restored. Once the situation returns to normalcy to the extent that civil government can function, military rule or government vanishes and ceases to exist. Ex parte Milligan, 4 Wall. 2, 71 U. S. 2, 121, 18 L.Ed. 281. Davis, supra, 305; Winthrop, supra, 1280. The argument that what was said in that case is dicta, is wholly unsound, because the government expressly argued that Milligan could be detained regardless of whether an act of Congress authorized it or not. (pp. 21, 92). See also: 1 Cooley's Blackstone, 350-351, n. 1.

Therefore, military government is not established by merely proclaiming it. It comes into being and exists solely by reason of the fact that strife prevents operation of the civil government. Ex parte Milligan, supra, 4 Wall. 127, 18 L.Ed. 281, where it is said: "As necessity creates the rule, so it limits its duration". In other words, whether military government prevails is a question of fact depending on the existence of facts in the territory where it is supposed to be controlling, and a proclamation of the military that it exists is superfluous and ineffective.

Where the military asserts a right to exercise some powers of government, usually in the form of restrictions, and do not approach a complete military government, the right, if it exists at all, comes from the right to do all that is necessary "to execute the Laws of the Union, suppress Insurrections and repel Invasions" and to protect each of the states "against Invasion". Compare: Winthrop, supra, 1275. Whether a particular action is "necessary" is a question of fact to be determined from proof of, among other things, the reason for the restriction, its purpose, and the improvement of methods and engines of war. What was not necessary a century ago, may be necessary today.

*Functioning of the Courts.* From what has been said it can be readily seen that the military have no authority to close any particular branch of government. If they had, it would be simple for a tyrannical executive to declare martial law, and then under a pretext of necessity, take in custody, the members of Congress, as well as the courts, thus effectually abolishing the Constitution. While the turbulence of conditions may prevent the legislative and judicial branches from operating, it is only such conditions which prevent such branches from operating, and not a rule or order of the military, which has no power to accomplish this effect.

The historical view shown in 14 Encyc. Britannica (14th Ed.) 984, still exists: "The 17th century view as to the position of the ordinary courts was clear and unequivocal. It was that if the civilian situation was such that the courts were able to sit at all, the judges were free to examine every arbitrary act of the military on its merits. If the civil situation was so 'warlike'—the term 'war,' in connection with martial law, does not mean war in the international sense, but war in the sense of rebellion or civil strife, as in the Statute of Treasons where it is declared to be treason for a subject to 'levy war' against the king in his realm—that the courts could not sit, the king's writ did not run, and the sheriffs and ministers of justice could not levy execution, then such facts constituted a state of war. (cf. Coke, Institutes I., 249b). But the existence of such facts must be proved to the satisfaction of the courts, if and when they were able to sit. The courts could thus, either at the time or after, decide whether the military measures taken to suppress the civilian commotion exceeded the necessity of the case, in precisely the same way as the courts always decide how far civilians and police are justified in using force to encounter and suppress force * * *."

*Habeas Corpus.* The writ of habeas corpus originated as "a writ by which the superior courts of the common law and the chancellor sought to extend their jurisdiction at the expense of inferior or rival courts" and "ultimately took form and survived as the writ of habeas corpus ad subjiciendum, by which the legality of the detention of one in the custody of another could be tested judicially. See Holdsworth, History of the English Law, Vol. 9, 108-125. Its use was defined and regulated by the Habeas Corpus Act of 1679, 31 Car. II, C. 2 * * *." McNally v. Hill, 293 U.S. 131, 136, 55 S.Ct. 24, 79 L.Ed. 238.

The Constitution of Massachusetts (1780) contained the following provision: "The privilege and benefit of the writ of

habeas corpus shall be enjoyed in this commonwealth, in the most free, easy, cheap, expeditious, and ample manner; and shall not be suspended by the legislature, except upon the most urgent and pressing occasions, and for a limited time, not exceeding twelve months." Part 2, c. 6, art. 7. The Constitution of New Hampshire (1784) contained a provision almost identical, except that the time limit was stated to be "three" months. Part 2, art. 91. The other state constitutions contain no express reference to the writ except that of Georgia which incorporated the principles of the habeas corpus act.

On August 20, 1787, there was introduced before the Federal Convention by Pinckney of South Caroline a resolution identical to the provision in the Massachusetts Constitution, except that the time limit was left blank. It was referred to the Committee of Detail. 2 Farrand, Records of the Federal Convention 334, 340, 342. Madison's notes, after stating that Pinckney urged the propriety of securing the benefit of habeas corpus, contains the following:

"Mr. Rutlidge [of South Caroline] was for declaring the Habeas Corpus inviolable —he did not conceive that a suspension could ever be necessary at the same time through all the States—

"Mr. Govr Morris [of Pennsylvania] moved that 'The privilege of the writ of Habeas Corpus shall not be suspended, unless where in cases of Rebellion or invasion the public safety may require it.'

"Mr. Wilson [of Pennsylvania] doubted whether in any case a suspension could be necessary, as the discretion now exists with Judges, in most important cases to keep in Gaol or admit to Bail."

The vote for the resolution discloses that the first part of the resolution to the word "unless" was adopted unanimously, while the remainder was adopted by a vote of 7 to 3. 2 Farrand, supra, 438. The word "where" was changed to "when" by the Committee of Style. 2 Farrand, supra, 596 —compare p. 576.

McHenry reporting to the Maryland House of Delegates on November 29, 1787, made the statement: "Public Safety may require a suspension of the Ha: Corpus in cases of necessity." Luther Martin of Maryland opposing adoption of the Constitution, several times stated that too much power was being given to the federal government over which the states could exercise complete control in cases of "necessity". 3 Farrand, supra 157, 213.

The provision of the Constitution as adopted is: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Article 1, § 9, cl. 2. The provision itself does not authorize any particular branch or individual to suspend the privilege of the writ. It impliedly authorizes suspension of the privilege of the writ when "in Cases of Rebellion or Invasion the public Safety may require it", but in such cases, only the "privilege" of the writ is suspended and not the writ itself.

In Ex parte Milligan, supra, 4 Wall. 130, 131, 18 L.Ed. 281, it is said: "* * * The suspension of the privilege of the writ of habeas corpus does not suspend the writ itself. The writ issues as a matter of course; and on the return made to it the court decides whether the party applying is denied the right of proceeding any further with it." The "privilege" meant by the Constitutional provision is not the right to obtain a writ, but the right to be discharged from custody by a habeas corpus proceeding. The judicial powers lodged in the courts by the Constitution cannot be taken away by either the executive or legislative branches of the government, anymore than the judicial branch can take away the powers of the other two. This, of course, means that the military have no more power to deprive a person of the privilege of the writ of habeas corpus than it has to suspend any other law or judicial power, as considered above.

Where a person is taken into custody by the military, he may obtain a writ of habeas corpus, and the court then decides the question as to whether or not the situation is one where "in Cases of Rebellion or Invasion the public Safety may require" that the petitioner be retained in custody. In my opinion, this simply means that the Constitution itself suspends the right to be released when it is shown that the action taken by the military is reasonably necessary for it "to execute the Laws of the Union, suppress Insurrections and repel Invasions" and to protect each of the states "against invasion". In other words, it is not a case where any branch of the government may suspend anything, but one which the Constitution itself provides the rule of suspension to all cases where the courts have made the appropriate finding. If the

courts find that the action of the military is reasonably necessary to accomplish one of the four purposes mentioned above, then the case is ended because the Constitution prohibits further action by the courts, but if the court makes a contrary finding, it has the Constitutional duty to carry out its function to declare the military action ineffective.

While extensive authorities need not be cited, two will be referred to. In Ex parte Milligan, supra, an act of Congress authorized the President to suspend the privilege of the writ of habeas corpus. The President did suspend it. The suspension was ineffective to prevent consideration of the case which was a habeas corpus proceeding. In United States ex rel. Quirin v. Cox, October 29, 1942, 63 S.Ct. 2, 9, 87 L. Ed. ——, a presidential proclamation prohibited access to the courts by petitioners. The proclamation was ineffective to prevent consideration of the cases which were habeas corpus proceedings, the court saying: "And neither the Proclamation nor the fact that they are enemy aliens forecloses consideration by the courts of petitioners' contentions that the Constitution and laws of the United States constitutionally enacted forbid their trial by military commission".

*Extent of Application of Rules.* The above applies to citizens of the United States within the territorial limits of the United States, but not to such citizens who are subject to the law of war or the articles of war. Whether aliens not subject to the law of war or articles of war are governed by the same rules I do not discuss.

Appellant was taken into custody in a territory belonging to the United States, but which is not one of the United States. Although a citizen he subjected himself to the rules applicable to that territory upon entering the same. Art. IV, Sec. 3, cl. 2, of the Constitution provides in part: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *." It could be, but is not, argued that when Congress incorporated the Territory of Hawaii, it did so subject to the limitations expressed in the Organic Act, 48 U.S.C.A. § 532, that the governor of such territory might "suspend the privilege of the writ of habeas corpus, or place the Territory or any part thereof, under martial law" and that such limitations expressly authorized a military government pursuant to the quoted Constitutional power. However, since no argument is made upon that precise point, and since it is assumed that a citizen's rights in the Territory of Hawaii are the same as those of a citizen in the United States, I have considered the case on that basis. See Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47; compare: Scott v. Sandford, 60 U.S. 393, 19 How. 393, 15 L.Ed. 691; Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088.

*The Instant Case.* The petition before us contains no allegation that the action of the military in detaining Zimmerman exceeded what was reasonably necessary. There is, however, the following allegation: " * * * that said Board, so purporting to act as aforesaid, and its order and decision in the premises, is null and void in that said Board was not and is not lawfully constituted, appointed and functioning for the purpose of depriving or with authority to deprive citizens of the United States of their constitutional rights of freedom and of being charged, tried and confronted by witnesses without the right to examine or cross-examine said witnesses as to the commission of any acts by such citizens subversive to the United States of America."

The petition does not show that Zimmerman was charged with or accused of violating the Constitution, a statute of the United States, a statute of the Territory of Hawaii, the Articles of War, the Law of War, any order of the President, the Secretary of War, the Military Governor or any other commanding officer. It was admitted on oral argument by appellee that no such violations were charged against Zimmerman. While the petition does allege that the cause or pretext of Zimmerman's detention was a certain order or decision made and entered by an alleged board of officers and civilians "appointed by the authorities of the United States", it nowhere appears who such authorities were. There is no more reason for assuming that such authorities were officers of the army than it was any other officer of the United States.

Rule 8(f), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, require that "All pleadings shall be so construed as to do substantial justice". Ex parte Burrus, 136 U.S. 586, 591, 10 S.Ct. 850, 852, 34 L.Ed. 500 states: "It is true

that perhaps the court or judge who is asked to issue such a writ need not be very critical in looking into the petition or application for very clear grounds of the exercise of this jurisdiction, because, when the prisoner is brought before the court or justice or judge his power to make full inquiry into the cause of commitment or detention will enable him to correct any errors or defects in the petition under which the writ issued." In Holiday v. Johnston, 313 U.S. 342, 350, 550, 61 S.Ct. 1015, 1017, 85 L.Ed. 1392, it is said: "A petition for habeas corpus ought not to be scrutinized with technical nicety. Even if it is insufficient in substance it may be amended in the interest of justice."

I think the quoted allegation is sufficient to raise the question of fact as to whether or not the Board was lawfully constituted, i. e., whether or not this particular Board was actually appointed in accordance with the orders of the so-called military governor. I think it also sufficient to challenge the power and authority of the Board, a question which may be tried by habeas corpus proceedings. McClaughry v. Deming, 186 U.S. 49, 51, 22 S.Ct. 786, 46 L.Ed. 1049.

Since the petition alleged grounds for the writ, in accordance with the rules previously mentioned, the proclamations attempting to suspend the privilege of the writ of habeas corpus, and to declare martial law—meaning military government—are wholly ineffectual to prevent the inquiry, and the court below erred in holding that he was prevented from issuing such writ because of such proclamations.

The question remains as to whether or not the writ should have issued. Since the allegations in the petition are inconclusive, I think the court below should have issued a writ, or preferably an order to show cause. After the return to the show cause order, and any traverse thereof are filed, the court can then determine whether there is an issue of fact to be tried. If such an issue is present, the writ must issue, and a hearing had. Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 85 L.Ed. 830. The petition and the traverse to the return may be treated together as the application for the writ. Id.

If, from such application, it appears that Zimmerman is held by the military within the authority granted by the so-called military governor, and that Zimmerman asserts that such action was not reasonably neces-

sary for the military in order "to execute the Laws of the Union, suppress Insurrections and repel Invasions" and to protect each of the states "against invasion", then a writ of habeas corpus should issue and the fact, as to whether Zimmerman's detention was "reasonably necessary" for the purposes mentioned, should be determined. If the court below finds the action of the military was "reasonably necessary" for such purposes, then it can proceed no further. If it finds such action not to be "reasonably necessary" it must order Zimmerman's release.

For these reasons, I dissent.